# WILLIAM CARROLL HOOVER *v.* ELIZABETH V. HOOVER

[No. 64, October Term, 1946.]

*Decided February 12, 1947.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Louis S. Ashman,* with whom was *Harry D. Barnes* on the brief, for the appellant.

*Edward D. E. Rollins* for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

Appellee filed a bill of complaint on February 2, 1946, in the Circuit Court for Cecil County against her husband, the appellant, to whom she was married on November 29, 1924. They have three children, two girls who are married; and a son who is now fifteen years

old.  The bill asked for a divorce on the ground of adultery alleged to have been committed by the appellant with one Edna Vaughan, since June 1, 1944, to the date of the filing of the bill.  The husband answered, denying the allegations of the bill and in the answer also claimed a constructive desertion by the wife and asked for a partial divorce.  This latter part of the answer was treated as a cross-bill and was answered by the appellee, neither admitting nor denying but calling for full proof. It may be noted here that the desertion consisted of leaving the appellant's room and refusing to do any cooking or laundry for him, although the parties remained in the same house.  The facts are admitted, but the wife claims that her actions are justified by the conduct of the appellant.  The whole substantive case, therefore, turns upon whether the appellee proved her allegations against the appellant.  On this issue the case was heard, testimony was taken, and the chancellor granted appellee a divorce *a vinculo*, with the custody of the fifteen-year-old son.  From his decree the husband appeals.

The husband is forty-eight, the wife is forty-four, and the alleged co-respondent is twenty-nine.  Testimony is that the parties got along fairly well until the depression and then had to accept public assistance for several years.  After that, the husband got a job on the State roads and the wife took in a boarder and occasionally got a job in a fireworks plant at Elkton, where they lived.  In the early part of 1941, both went to work at the Triumph explosives works near Elkton.  The wife worked there until April, 1945, when her youngest daughter married and she had to stay home to do the housekeeping and to get her son to go to school.  The first question involving the relations of the husband with other women arose in 1942 when the wife heard rumors that he was intimate with one of the policewomen at the explosives works who lived at Port Deposit.  During that entire summer, appellant would take the appellee up to Port Deposit to see this woman and her husband, the husband being home at certain times and at other times

not. Finally, appellee told her husband she was not going there any more because she had heard rumors about him and the woman. In the fall of 1944, she found a picture of this woman in his wallet. The woman had moved to Pennsylvania just about that time. The husband admitted to her, and in his testimony, that he had this picture, but denied any improper relations. He did admit he had taken her home one night from the plant.

In 1944, the wife testified a letter came to the house addressed to "W. O. Hoover." This letter and the envelope were put in evidence. It was written from Crab Orchard, West Virginia, on March 21, 1944, and it clearly indicated intimacy between the writer and the person to whom it was addressed. The husband showed it to his wife when it came to the house, according to the testimony, but said it did not belong to him and denied knowing anything about it. He kept the letter, however, and it was found by his wife about the time of the separation, and was put in evidence. The husband's testimony is that he kept it because it was no good to him and that he did not know any person by the name of the signer of the letter. He made an effort to testify that there was a William Octor Hoover employed at the plant, but could not produce any proof of this, although his counsel attemped to subpoena records from the plant. No such records, however, were produced, as far as the transcript here shows, nor was any other evidence offered to this effect.

In the latter part of September, 1945, the appellee testified she found a letter in pocket of appellant's shirt, folded with a clip on each end. This letter was admitted in evidence. She said she asked him about it and he said he found it in the personnel building and later, after consideration, he said he found it in the paper room at the Triumph plant. He said he did not know who wrote it. The letter is not signed and bears intrinsic evidence that the writer had intimate relations with the person to whom it was sent. The husband testified that his wife's testimony as to her finding the

letter in his pocket was correct, but that he had found it in the paper room at the plant, did not know to whom it was addressed, and he was going to put it back where he had found it, but did not do it. This testimony was attempted to be corroborated by the guard who worked with him at the plant, and who testified that the appellant found a letter similar in appearance to the one offered in evidence on the "army side" of the plant. He did not read the letter and did not know anything more about it. This guard also testified that Edna Vaughan worked on the "navy side" of the plant, which was across the road.

The importance of this letter is that it was claimed to have been written by Edna Vaughan. She denied it. A note was produced which Edna Vaughan had written for a girl who was sent to see her by the appellee, with an autograph book with the purpose in mind of getting a copy of her handwriting. At the trial, the appellee's counsel dictated portions of the letter to Edna Vaughan, and her copy of these was also admitted in the evidence. A bank official, whose business it was to know handwriting, testified as an expert that in his opinion the writing on the disputed note, and the admitted writing of Edna Vaughan on the autographed note, were the same. The chancellor, in his opinion, stated that he was convinced that Edna Vaughan had written the disputed note.

The appellee testified that she did not know Edna Vaughan, and had no knowledge about her relations with her husband until the 23rd of December, 1945. In July prior to that, she had gone to stay with her sister who was operated on at that time. The understanding with her husband was that she was to stay three weeks, and the last two weeks, which were his vacation, he was to join her. He did not do so until two days before they came home. After that time, his wife saw a difference in him and suspected he was going to see someone, but did not know where. One day she followed him downtown in the morning and it looked like he went in

112 Bow Street, which was where Edna Vaughan lived. When she taxed him with that, he said he went to a barber shop which was under the same roof. On December 23, 1945, the appellee received a visit from Clinton Vaughan, the estranged husband of Edna Vaughan, who was in the army. When the appellant came home, after this conversation, his wife told him that Vaughan had told her that the appellant had been visiting Vaughan's wife, for over a year, that Vaughan had seen him in the house and had asked him to leave, that appellant had refused, and that Vaughan had gone to get a town officer. According to appellee's testimony, her husband admitted that he had been going there for about a year. When she asked him what he was going to do about it, he said he would settle it after Christmas. This testimony was corroborated by the married daughter of the parties who was living at home. Appellant admitted saying that he would settle the matter after Christmas. The appellee said that the following morning at breakfast, she told her husband she could not go along if he was going to see Edna Vaughan, and he again said he would settle it after Christmas. Appellee testified she went down to see Edna Vaughan in the afternoon at the 5 and 10 cent store where she was then employed. There was no conversation between husband and wife on Christmas Day about the matter, but on the following evening, when the husband came home about 9 or 10 o'clock, the wife said she asked him again what he was going to do about it. She testified he then said he knew he had done her wrong and that things would never be same between them. She said she was willing to go on if he was. She asked him then if he loved Edna Vaughan and he said he did and that he was going to stick to her. That was on December 26th. On December 27th, the wife left her husband's room, went into a room with her daughter, put a lock on the door, and since that time has not lived with her husband. She testified that for three or four weeks before she brought the suit, she asked her husband a dozen times why he did not let

the woman go, and he said he was still going around there.

On December 30th, the appellee, with her next-door neighbor and the latter's stepson, went to Edna Vaughan's door and had a talk with the latter. This is testified to by all three. After this conversation, the appellee told her husband she had been to see Edna Vaughan, and that the latter had said she loved him and was going to stick to him. She asked her husband if he was going to keep on going and he said he was. On January 17th, the appellee, with a neighbor and the latter's stepson, went in a car to the location of the Vaughan house and parked so that they had a good view. This was at 9.30 P. M. The lights were on in the house upstairs and downstairs. They stayed until 10.30, at which time, they all testified the appellant came down the back steps from the house, went across the lane and on down the street. They waited about five minutes; the lights went out downstairs and then they left. All the shades were tightly drawn and nothing could be seen inside the house. In addition to the husband's admission that he had been to the Vaughan house seven or eight times, there is corroborating evidence of his frequent visits by disinterested witnesses who saw him there.

The appellant's story, corroborated by Edna Vaughan, is that his wife had asked Edna Vaughan to enter into a conspiracy with her to catch her husband so as to enable her to get a divorce from him; that she had asked Edna Vaughan to make a date with him; that Edna had met him on the street and suggested to him that they have a date and he declined, saying that he was a married man. Edna thereafter told her husband and that was the occasion for Edna's husband going to see the appellee. The appellant denied he ever said he was in love with Edna Vaughan, although he admitted going to her house a number of times. He produced at the trial an innocuous letter and a number of envelopes addressed to his wife and written by a young soldier. It was testified that this soldier was a friend of their chil-

dren and had been going with the younger daughter, and the letter was such as many soldiers wrote during the war, when they were away from home, to older people they knew and liked. The appellee frankly admitted receiving these letters, and there was nothing in the one produced to justify its admission in evidence against the wife. The husband produced two other letters which he claimed he found in the house. One of these was dated February 5, 1945, was addressed to "Dear Elizabeth," and enclosed a Pennsylvania Railroad ticket with the same date stamped on it for passage between Elkton and Washington. The letter said its purpose was to return the ticket which addressee "left on the bureau." The letter is written in endearing terms, expresses love, and speaks of the possibility of the writer, who signs himself "Pete," marrying the person to whom the letter was addressed. The second letter, undated, is also signed "Pete," and states that the writer has finally gotten his discharge papers and speaks of the time when the writer was made happy by being told that "Elizabeth," to whom the letter was addressed, told him that she loved him and would get rid of "Jess Sharpless and Bill Hoover." The appellant testified that he found one of these letters in the desk and another in a shot bag. No envelopes were produced, the writer was not identified, and it was not shown that they had ever been in the possession of the appellee. She denied positively ever having seen them, and said that Jess Sharpless, mentioned in one of them, was a friend of her husband's who had boarded at their house some time before, but had been asked to leave because he set a bed on fire while drunk. Under these conditions the "Pete" letters were not evidence against the appellee, and their admission was properly refused by the court. Edna Vaughan testified in her own behalf. In addition to the story previously related about the appellee's efforts to get her to conspire with her to get a divorce from the appellant, she denied that the letter found in the appellant's shirt pocket was written by her, and denied she

had had any improper relations with appellant, and told of a physical condition which she claimed would prevent such relations. This last statement was corroborated in part, but not conclusively, by a physician.

A number of questions are raised by the appellant in his brief, but most of them are technical and trivial and we find no reversible error in the court's action on any of them. One of the contentions made is, because the appellee in her answer to the appellant's answer and cross-bill does not deny the affirmative averments, but simply calls for full proof, that, under General Equity Rule 20, these averments should be deemed to be confessed. An answer and a cross-bill should not be combined in one paper, and the paper filed by the appellant illustrates the reason for this. It is difficult to determine which statements are in answer to the bill of complaint and which are intended to present a basis for a decree *a mensa*. However, if we consider the grounds of the limited divorce to be the desertion alleged, the appellee did not dispute the facts, but the conclusions to be drawn from them under the circumstances. Her testimony as to these facts applied to her own allegations as well as to those of the appellant. It was not objected to, and, as she points out in her brief, both Equity Rule No. 20 and Equity Rule 17 permit amendment. So if this question had been raised before the chancellor, the latter would have been able to permit an appropriate amendment to the answer to make the testimony admissible if it were not already so. As to this testimony, therefore, the appellant by his failure to interpose seasonable objections must be presumed to have waived whatever rights he had.

Another question relates to the admission of testimony that on December 26th, the wife drew a large sum of money from the joint bank account of the parties and placed it in her own name. The chancellor correctly held that in a divorce case he had only limited authority to pass upon property rights of the parties. However, this evidence might be admissible as tending to support the appel-

lant's claim that the whole case was a conspiracy to get a divorce and that the appellee had offered Edna Vaughan money to entrap the appellant and had offered appellant money not to contest the divorce. We think, however, that enough of the facts respecting this withdrawal were admitted in evidence to permit the chancellor to consider this argument, and even if all of the evidence offered by the appellant in this respect and stricken out by the chancellor, had been before us, we would still reach the same conclusion we have reached.

The main question in the case is whether the evidence sufficiently proves the charge made against the appellant in the bill of complaint. The chancellor, who saw the witnesses and had an opportunity to determine which were telling the truth and which were not, came to the conclusion that the evidence was sufficient. We agree with this conclusion. We think the evidence shows sufficiently that the appellant had a disposition to run around with other women than his wife and that he showed a marked inclination for the co-respondent and visited her far too many times for anyone with common sense to believe that his visits had to do with the sale of an auto tire to her husband and the return of some tools given in security for it, as he testified. Nor do we think the wife condoned his derelictions by remaining with him until December 27th. She had no positive proof even then, although the visit of the co-respondent's husband was enough to make her extremely suspicious. She had hopes, however, of persuading her husband to give up Edna Vaughan, and, as she testified, continued to have these hopes up until the time she brought suit. She did have the letter she had found in her husband's shirt pocket, but she had no proof that this came from Edna Vaughan until December 29th when she sent the young girl around to get Mrs. Vaughan's autograph. Her first direct evidence was on January 17, 1946, when she and her next-door neighbor and the latter's stepson saw her husband come out of Edna Vaughan's house after he had remained there at least an hour.

We think that the case as presented shows that the appellant had the inclination and the opportunity, both of which are required to justify a decree of divorce on the ground of adultery if no direct proof is available, and we think the decree of the chancellor should be affirmed.

*Decree affirmed, with costs.*