Albert Sublet IV v. State of Maryland, No. 42, Sept. Term, 2014, Opinion by Battaglia, J.

Tavares D. Harris v. State of Maryland, No. 59, Sept. Term, 2014, Opinion by Battaglia, J.

Carlos Alberto Monge-Martinez v. State of Maryland, No. 60, Sept. Term, 2014, Opinion by Battaglia, J.

**EVIDENCE – AUTHENTICATION – ELECTRONICALLY STORED INFORMATION – SOCIAL NETWORKING**

Authentication of pages from a social networking website pursuant to Maryland Rule 5-901, which provides that authentication of evidence is a condition precedent to its admissibility, requires proof from which a reasonable juror could find that the pages are what they purport to be.

No. 42 - Circuit Court for Anne Arundel
       County, Maryland
       Criminal No. K-2012-002287
       Argued: February 6, 2015
No. 59 - Circuit Court for Montgomery
       County, Maryland
       Criminal No. 121279
       Argued: February 6, 2015
No. 60 - Circuit Court for Prince
       George's County, Maryland
       Case No. CT12-0824X
       Argued: February 6, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 42
September Term, 2014

Albert Sublet IV v. State of Maryland

No. 59
September Term, 2014

Tavares D. Harris v. State of Maryland

No. 60
September Term, 2014

Carlos Alberto Monge-Martinez v. State
of Maryland

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,
             JJ.

Opinion by Battaglia, J.

Barbera, C.J., Harrell and Adkins, JJ.,
concur & dissent in No. 42 only

Filed: April 23, 2015

The rapid rise of social networking websites,[1] themselves a branch of social media,[2] once again gives us cause to explore the authentication of documents related to this genre, under Maryland Rule 5-901, which provides that the "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims", in three cases, *Sublet v. State*, *Harris v. State* and *Monge-Martinez v. State*, consolidated for the purposes of this opinion. All three cases involve the same legal issues, those being the elucidation and implementation of our opinion in *Griffin v. State*, 419 Md. 343, 19 A.3d 415 (2011), in which we addressed the admissibility of a screenshot[3] of a MySpace[4] page, and its

---

[1] Social networking websites are characterized by a format that allows users to create online profiles through which they share information, photographs and videos with other users. Kathryn L. Ossian, Social Media and the Law §1:2.1 (2014). Users, in addition, are able to comment on each other's postings. *Id.*

[2] "Social media is defined as 'forms of electronic communication . . . through which users create online communities to share information, ideas, personal messages, and other content.'" Ossian, *supra*, §1:1, quoting Merriam Webster Dictionary *social media* (11th ed. 2009).

[3] A "screenshot" is an image that depicts only the content of the computer screen. Merriam–Webster's Online Dictionary (2015), *available at* http://www.merriam-webster.com/dictionary/screenshot (last visited Apr. 20, 2015). "Screenshot" is synonymously used to indicate a picture taken of the screen of a cellular telephone. *E.g. Richards on behalf of Makayla C. v. McClure*, 858 N.W.2d 841, 844 (Neb. 2015) (witness took "screenshots" of text messages at issue that "show[ed] the actual screen of the text messages").

[4] "MySpace is a 'social networking' website where members can create 'profiles' and interact with other members." *Griffin*, 419 Md. at 346 n.2, 19 A.3d at 417 n.2. "Anyone with Internet access can go onto the MySpace website and view content which is open to the general public such as a music area, video section, and members' profiles which are not set as 'private.'" *United States v. Drew,* 259 F.R.D. 449, 453 (D.C.D. Cal. 2009).

application to the authentication of screenshots of messages allegedly sent through social networking websites; in *Sublet*, via a Facebook[5] timeline;[6] in *Harris*, on Twitter[7] through "direct messages"[8] and public "tweets";[9] and, in *Monge-Martinez*, through Facebook messages.[10]

---

[5] Facebook users create online profiles to share information about themselves with other Facebook users. Joshua Briones & Ana Tagvoryan, Social Media as Evidence 1:5:1:1 (2013). Facebook is currently the most popular social-networking website, (*id.*), with over 757 million daily active users, (Facebook Reports Fourth Quarter and Full Year 2014 Results, Facebook.com, http://investor.fb.com/releasedetail.cfm?ReleaseID=893395 (last visited Apr. 20, 2015)).

[6] On Facebook, a "Timeline is the virtual space in which all the content of every Facebook user is organized and shown." What is a Facebook Timeline?, Rom Cartridge Technology Explained, http://www.romcartridge.com/2011/12/what-is-facebook-timeline.html (last visited Apr. 20, 2015). Facebook users can, generally, comment to anything shown on a user's timeline, including one's own material. Commenting, Facebook.com, https://www.facebook.com/help/499181503442334/ (last visited Apr. 20, 2015).

[7] Twitter users share brief messages with one another of 140 characters or fewer, referred to as "tweets". Ossian, *supra*, § 1:2.2.

[8] On Twitter, "Direct Messages" are "one-on-one private conversations, or between groups of users" that are only visible to the intended recipients. About Direct Messages, Twitter.com, https://support.twitter.com/articles/14606-about-direct-messages (last visited Apr. 20, 2015).

[9] "A Tweet is any message posted to Twitter which may contain photos, videos, links and up to 140 characters of text." New user FAQs, Twitter.com, https://support.twitter.com/articles/13920-new-user-faqs (last visited Apr. 20, 2015). By default, "tweets" are publically available. *Id.*

[10] On Facebook, "Messages" may be sent to any Facebook user and are only visible to the recipient of the message. Sending a Message, Facebook.com, https://www.facebook.com/help/326534794098501/ (last visited Apr. 20, 2015).

We shall hold that, in order to authenticate evidence derived from a social networking website, the trial judge must determine that there is proof from which a reasonable juror could find that the evidence is what the proponent claims it to be. We shall hold in *Sublet* that the trial court did not err in excluding the admission of the four pages of the Facebook conversation. We shall hold in *Harris* that the trial court did not err in admitting the "direct messages" and "tweets" in evidence. We shall also hold in *Monge-Martinez* that the trial court did not err in admitting the Facebook messages authored by Monge-Martinez.

*Sublet v. State*

Albert Sublet, the first Petitioner herein, was charged by indictment in the Circuit Court for Anne Arundel County with three counts of first degree assault, second degree assault and reckless endangerment, as well as with one count of carrying a deadly weapon with intent to injure. The charges against Sublet arose out of a fight that occurred among Sublet, Chrishell Parker, her mother and her sister, in late October of 2012. According to the State's theory of the case, Sublet became aggressive when he arrived at Ms. Parker's apartment to pick up his girlfriend, Ymani Conner, and initiated an altercation; Sublet urged, conversely, that it was Ms. Parker who was the instigator.

During cross-examination of Ms. Parker, Sublet's counsel sought to introduce into evidence four pages alleged to have been a printout from Ms. Parker's Facebook page of a "conversation" among seven different individuals. The document submitted to Ms. Parker for review consisted of four pages and written across the top of each page was "printed on

3

10·30·12 from Facebook".[11]  Each of the nineteen entries in the four pages contained the name of the profile that had allegedly created it, as well as the time the entry was created. Next to the name of the profile was also a picture.  The four pages were collectively received for identification as Defense Exhibit A.[12]

With respect to the conversation in issue, the first page began on "Saturday" with a statement associated with the profile "Chanica DatBytch Brown", which Ms. Parker identified as Ms. Brown's Facebook username, while the fourth post on the first page was related to the name "Cece Parker".  When asked if she had discussed the altercation on Facebook, Ms. Parker stated that she had connected with Chanica Brown through Facebook and that she herself used the name Cece Parker:

> [ATTORNEY FOR SUBLET]:  Well, have you discussed [the fight] in social media?
> [MS. PARKER]:  Social media?
> [ATTORNEY FOR SUBLET]:  Like Facebook?
> [MS. PARKER]:  Well, I'm not going -- people inboxed me and said I heard what happened to you, are you okay? And, yes, I have discussed it on Social Network.
> [ATTORNEY FOR SUBLET]:  Okay.  And you discussed it with a lady by the name of Shanika [sic] Brown, is that correct?
> [MS. PARKER]:  Yes.
> [ATTORNEY FOR SUBLET]:  And with a lady by the name of CiCi [sic] Parker?
> [MS. PARKER]:  That's me.

The posts depicted on the first page were:

**Chanica DatBytch Brown**

---

[11] The source of the handwriting, as well as who had compiled the pages, were never identified.

[12] Defense Exhibit A includes all four pages, but it is only the fourth page that appears to be under consideration in this appeal.

Saturday via Mobile
Had a BLAST lastnight… Shit got hectic hahaha ymani has more to come..lmaowack bytch
Share

- 2 people like this

**CanDii SoSeductive P** Smhh
Saturday at 13:12 via mobile

**Camerin Kill'Ent Johnson** Yesssssssa lol
Saturday at 14:15 via mobile

**Cece Parker** yea everytime i see that bitch ima fuck that dirty pussy bitch up . shout out to cam cam u was riden
Saturday at 15:42 via mobile · 1

**Tyesha Glover** hahahahaha yea whore i agree……..@ cece the whole hood was ridin
Saturday at 17:24

**Cece Parker** yea.. dey was tho that shit was crazy
Saturday at 20:27 via mobile · 1

On the second page was a single entry affiliated with the user name "Zaquane Graham"

lamenting being left out of the conversation:

**Zaquane Graham** Yall n[****]s maken me mad not tellin a n[***]a was goin on the way i feel im sayin fuck it dam im way down here and yall not tryin to keep me postedon was goin on u know wat fuck it i dn want to know
Yesterday at 18:42 via mobile

On page three, Ms. Brown purportedly conversed with "Zaquane Graham" and "Tonisha

Brown":

**Chanica DatBytch Brown**
Yesterday via Mobile
She still tawkn shit mmmhm but u want to block me u not real ymani Conner u can keep hiding u an ya broke ass man that jus started working at bed bath an beyond out in the mall we will find yal or shuld i say u cuz he goin jail i got his pic lmao stupid hoe kp ya legs close bitch dont go down gardens cuz (INSIDER) its not safe lol

5

Share

- 3 people like this.

**Zaquane Graham** Dammm thats real talk y yall fightin anyway im about o kick both yall assess y yall fightin
Yesterday at 15:02 via mobile

**Tonisha Brown** I love you..you got me pissed off so take ya time read what I said an u will get it..
Yesterday at 15:19 via mobile · 1

**Chanica DatBytch Brown** im not tripn off nobody u dnt even nko nothing so…..
Yesterday at 15:40 via mobile

**Zaquane Graham** Inbox me nica
Yesterday at 15:40 via mobile

**Chanica DatBytch Brown** an thats not my godsister an i stamp that….
Yesterday at 15:42 via mobile

The fourth page contained six posts; an initial one identified with "Chanica DatBytch Brown", followed by two more posts allegedly from "Cece Parker":

**Chanica DatBytch Brown** demondra trenice Erica are my godsisters motjer of mines
Yesterday at 15:43 via mobile

**Cece Parker** ima say this it anit over #fact
Yesterday at 16:40 via mobile

**Cece Parker** her bf is a dead man walkn
Yesterday at 16:44 via mobile

**Zaquane Graham** Wtf is goin for real
Yesterday at 17:05 via mobile

**Chanica DatBytch Brown** call me brova 4438227645 @cece i kno i frel u my G
Yesterday at 20:56 via mobile

**Chanica DatBytch Brown** feel u

6

At trial, Ms. Parker was confronted with the four pages by Sublet's counsel, who asked her to "look this over" and then asked her if she had "said those things" attributed to her, to which she agreed. When Sublet's counsel then inquired as to whether Ms. Parker disliked Ms. Conner, Ms. Parker asserted that she did not know Ms. Conner prior to the night of the incident and, furthermore, urged that she did not have "any personal animosity against Ms. Conner". As defense counsel began to ask about the content of the entry attributed to Ms. Parker on the fourth page that read, "her bf is a dead man walkn", the trial judge intervened to address the issue of authentication of the Exhibit:

> [ATTORNEY FOR SUBLET]: What about this statement?
> [MS. PARKER]: That's not to her. I don't know what she's talking about. It's two different things.
> [ATTORNEY FOR SUBLET]: So when you said -- these are your words, you said, her boyfriend is a dead man walking --
> [STATE'S ATTORNEY]: Objection, your Honor.
> THE COURT: One moment. Just a moment. Let me ask counsel to approach the bench. And ask the jury to disregard the statement from counsel at this time.

Outside the presence of the jury, the trial judge stated that, "it [was] not clear to [him]" that "[Ms. Parker] agrees that everything is something that she wrote." The judge then permitted Sublet's attorney to continue questioning Ms. Parker "to see if there are any things that say ['Cece'] that she does not agree that she wrote".

During further questioning by Sublet's counsel, Ms. Parker affirmed that it was her picture next to the entries allegedly authored by "Cece Parker". Sublet's attorney then directed Ms. Parker to "Look at all of the pages", "If you find one that you didn't write,

7

please let us know", to which Ms. Parker asserted she did not write the entries on the last page, and she did not understand where they came from.

Upon further exploration by Sublet's counsel regarding the genesis of page four, Ms. Parker explained that she "[gave] her logout name and password to other people", such as "[t]he girl Shanika [sic]" and, ostensibly, to others, who would "hack your page and [write] stuff on there":

> [ATTORNEY FOR SUBLET]:  Do you have a Facebook page?
> [MS. PARKER]:  Uh-huh.
> [ATTORNEY FOR SUBLET]:  Is that correct?
> [MS. PARKER]:  Uh-huh.
> [ATTORNEY FOR SUBLET]:  And it is in the name of CiCi [sic] Parker, is that correct?
> [MS. PARKER]:  Yeah, but I give my logout name and password to other people too.
> [ATTORNEY FOR SUBLET]:  Who?
> [MS. PARKER]:  The girl Shanika [sic] I gave it to her.  So, that's why I'm like, I didn't understand the last page.  So, it might have been her on my page.
> THE COURT:  I am sorry, who did you say you gave it to?
> [MS. PARKER]:  Shanika. [sic]
> [ATTORNEY FOR SUBLET]:  But you are conversing with Shanika [sic].
> [MS. PARKER]:  No.
> [ATTORNEY FOR SUBLET]:  So, Shanika [sic] is conversing with herself on Facebook?
> [MS. PARKER]:  No.  That's what they do on there.  Like they will hack your page and be writing stuff on there.

The trial judge, thereafter, sustained the State's objection to admission of all four pages of Exhibit A, based upon three findings: that Ms. Parker's password was not a secret, that other people could and had presumably accessed and changed or inserted information on Ms. Parker's Facebook page, thereby attributing it to her, and that Ms. Parker's explanation was not disputed by expert testimony:

8

THE COURT: Okay. I am inclined to sustain the objection because the witness has testified, A, that her password is not a secret. B, that other people can and have hacked her Facebook page and have changed statements on it. And, C, if I am not losing track of my bullet points, we don't have expert testimony to dispute her.

So, we have only one layperson's testimony, which is that she has had the experience that people have altered her Facebook page including the statements, the conversations and therefore, she, in this particular case, thinks that is altered and she didn't actually do that.

So, I don't even find by a preponderance of the evidence that there is a sufficient basis for reliability to admit it. So, I will sustain the objection at this time.

Sublet subsequently was convicted of two counts of second degree assault and sentenced to ten years' imprisonment with all but four years suspended, as well as five years' probation.

In an unreported opinion, the Court of Special Appeals affirmed the trial court's exclusion of the Facebook pages.[13] We granted Sublet's Petition for *Certiorari* to address the following questions:

> 1. Did the lower courts err by excluding crucial Facebook evidence on authentication grounds where the suspected author of the Facebook posts testified at trial, admitted discussing the fight on Facebook, and recognized this specific Facebook conversation, and where the posts contained numerous distinctive characteristics demonstrating authenticity?
>> A. In excluding crucial Facebook evidence on authenticity grounds, did the lower courts err by applying an incorrect legal standard?

---

[13] The questions presented in the Court of Special Appeals were:
1. Did the trial court abuse its discretion by excluding crucial Facebook evidence on authenticity grounds when it applied an incorrect legal standard and the evidence had been properly authenticated?
2. Did the trial court abuse its discretion in providing an unresponsive and misleading supplemental jury instruction that did not cure the jury's confusion on the central issue of self-defense?

9

B. In assessing the Facebook evidence, did the lower courts err by not applying a correct and complete authentication analysis?

*Sublet v. State*, 438 Md. 739, 93 A.3d 288 (2014).

*Harris v. State*

Following a shooting at the Rockville Metro Station on May 18, 2012, in which Jared C.[14] and Wasima Gary were injured, Tavares Harris, the second Petitioner herein, was charged in a nine count indictment with two counts of attempted first degree murder, two counts of attempted second degree murder, two counts of assault in the first degree, two counts of use of a handgun in the commission of a felony and one count of conspiracy to commit murder.

The day before the subject shooting, during a fight among students at Richard Montgomery High School, Keon, a friend of Harris's, was punched by James, a friend of Jared C.'s. Apparently, according to trial testimony, the punch occurred because Jared C. planned to rob Keon. Harris, according to the State, then planned to shoot Jared C. in retaliation, as reflected in "direct messages"[15] sent via Twitter and recovered from an

---

[14] Some individuals associated with Harris's case are juveniles, so we refer to them only by their first name and initial of their last name.

[15] "Direct messages" are "one-on-one private conversations, or between groups of users" that are only visible to the intended recipients. About Direct Messages, Twitter.com, https://support.twitter.com/articles/14606-about-direct-messages (last visited Apr. 20, 2015).

iPhone[16] found in Harris's bedroom during the execution of a search warrant, as well as public "tweets"[17] obtained from an Android phone[18] recovered from Harris's person.

During discovery, the State notified the defense that it "intend[ed] to call Montgomery County Police Detective Jesse Grimes as an expert witness in [this] case" and that he would testify with respect to, *inter alia*, "analysis and interpretation of digital evidence" recovered during the investigation, including the "direct messages".

At trial, prior to Detective Grimes's testimony as an expert in the field of forensic examination of cell phones, the State informed the trial court that it would "want to move into evidence . . . those contents of the twitter messages", to which Harris's counsel objected. The trial judge decided the issue of authentication outside the presence of the jury.

The State proffered that Detective Grimes would testify that, through the use of special software, he had retrieved the "direct messages" from the iPhone and determined that "TheyLovingTc" and "OMGitsLOCO" were the participants to the conversation, based upon "some more information that the phone carries that reflects this chat." The State proffered, furthermore, that through Detective Grimes it would move into evidence

---

[16] The iPhone was received in evidence as State's Exhibit 76.

[17] A "Tweet" "is any message posted to Twitter which may contain photos, videos, links and up to 140 characters of text" and, by default, is publically available. New user FAQs, Twitter.com, https://support.twitter.com/articles/13920-new-user-faqs (last visited Apr. 20, 2015).

[18] The Android phone was received in evidence as State's Exhibit 72.

the forensic examination report of the iPhone he had compiled, which included the content of the conversation, the times the respective "direct messages" were sent and received by the phone, and that "OMGitsLOCO" and "TheyLovingTc" were the parties to the conversation.[19]

The "direct messages" reflected a conversation between "OMGitsLOCO" and "TheyLovingTc", which later was received in evidence at trial as State's Exhibits 91 and 92.[20] Detective Grimes explained, when viewing the "direct message" conversation, that those messages sent from the iPhone appeared within a green box on the right hand side of the screen, while the other party's Twitter name was displayed across the top of the screen and his or her messages appeared in a white box on the left hand side of the screen.

In the conversation depicted in Exhibits 91 and 92, "OMGitsLOCO" references a "shooting", the need to "avenge keon" and that "they should have neva fucked wit Y2C",[21] to which "TheyLovingTc" agreed:[22]

---

[19] An extract of Detective Grimes's report regarding the "direct messages" was received in evidence as State's Exhibit 96.

[20] State's Exhibit 92 was a screenshot showing the first half of the conversation, while State's Exhibit 91 showed the second half of the same conversation, with significant overlap.

[21] According to trial testimony, Harris and his friends called themselves "Yearnings Too Crazy", or "Y2C" for short.

[22] The boxes represent the location of "profile pictures", which are personal images selected by whomever created the Twitter profiles. *See* Customizing your profile, Twitter.com, https://support.twitter.com/articles/127871-customizing-your-profile (last visited Apr. 20, 2015). At trial there was testimony that the "profile picture" accompanying the "direct messages" from "TheyLovingTc" was a photograph of Harris.

@TheyLovingTc

5/17/12 8:53 PM

Ite and tell them bitch ass n[****]s to come to the farm cuz I don't feel safe shooting them right by the police station unless we got the car

5/17/12 9:09 PM

They not gone come we gone try but if not we gone do what we do

5/17/12 9:11 PM

Alright say no more we not goin out like that

5/17/12 9:23 PM

That's what I'm saying

5/17/12 9:25 PM

Yeah man I don't care nomore.  I'm just now starting to becomes a real n[***]a.  We gon avenge keon.

5/17/12 10:12 PM

hell yeah .

5/17/12 10:16 PM

I started to fall off but ya boi Is back and they should have neva fucked wit Y2C bra it's game ova

The trial judge determined that State's Exhibits 91 and 92 were properly authenticated, because, along with the proffer of Detective Grimes's testimony, there was independent verification of the Twitter account:

> THE COURT: Right.  Okay so last night an issue arose with respect to the testimony of Jesse Grimes, the State's expert, who was expected to testify as to the identity of the sender of a number of tweets.
>     * * * We heard yesterday that Jesse Grimes was able to make a determination through computer software.  The defense acknowledges that they knew what the conclusion was, but not the methodology.  We also have independent verification of the identification of the identity of the Twitter

13

account, Jahmil T[.][23] testified that "Oh my God, it's Loco" [phonetic sp], is Foulke's[24] Twitter name.[25]

Defense further argues as to the lack of identification of the sender. Reviewing the cases of *Dickens* and *Griffin* I'm satisfied the State has properly laid the foundation for authentication of these Tweets.

Detective Grimes subsequently testified, consistent with the State's proffer, that he was able to access "the contacts, the call logs, . . . images, . . . videos, [and] Twitter chats" on the iPhone. Detective Grimes identified State's Exhibits 91 and 92 as screenshots displaying the "direct message" conversation. The Detective further explained that, using forensic software, he was able to compile those conversations into a separate report which identified that the "direct messages" sent from the phone were authored by "OMGitsLOCO" and that the phone received messages from "TheyLovingTc".[26]

---

[23] Jahmil T. was the State's primary witness with respect to the dynamics of Harris's group of friends.

[24] Foulke was a member of Harris's group of friends, according to Jahmil T.

[25] Jahmil T. testified on cross-examination that "Foulke's Twitter name" was "OMGitsLOCO":

[ATTORNEY FOR HARRIS]: Do you remember what "OMGitsLOCO" is?
[JAHMIL T.]: Yes.
[ATTORNEY FOR HARRIS]: What is that?
[JAHMIL T.]: Foulke's Twitter name.
[ATTORNEY FOR HARRIS]: Is it Foulke's Twitter name?
[JAHMIL T.]: Yes.
[ATTORNEY FOR HARRIS]: And that would appear on his direct messages, correct?
[JAHMIL T.]: Yes.

[26] Detective Grimes testified that, because there was a lock on the Android phone, he could not perform a full forensic examination of the device as he had been able to do on the iPhone.

The public "tweets" recovered from the Android phone recovered from Harris's person also were received in evidence as State's Exhibits 88 and 89. State's Exhibit 88, with the timestamp of May 17, 2012, stated that things would "get real tomorrow" and was accompanied by the same profile photo that had been identified as Harris's:

> ☐ Tc x TΦ$Δ
> @TheyLovingTc
> Shit finna get real tomorrow
> 10:14 PM · 17 May 12

State's Exhibit 89, also reflecting the date of May 17, 2012, contained the same profile photo and reiterated that the author was going "all in tomorrow":

> ☐ Tc x TΦ$Δ
> @TheyLovingTc
> Haha i cant do nun but sit back and laugh n[****]s on that grimy shit gotta sneak my yung n[***]a Fuck Probation im all in tomorrow
> 10:26 PM · 17 May 12

Immediately after the trial judge determined that the "direct messages" were admissible, State's Exhibits 88 and 89, the "tweets" recovered from the Android phone, were admitted. The trial judge determined that State's Exhibits 88 and 89 were properly authenticated, because they were authored at the same time as the "direct messages" that had just been authenticated and they contained content that would only have been created by "a few people":

> THE COURT: Authenticated, thank you. These are done at the same time the public tweet is just after the direct message which ends with "we going to avenge Keon, hell yeah," that's at 10:12. And a statement made at 10, six – okay. He must be on two phones or flipping back and forth, I don't know how that works, at 10:14 he says, "finally get real tomorrow," that -- and the "hell yeah" to "we going to avenge keon" is at 10:12. And then the "I'm all in tomorrow" is at 10:26. Also, we have pictures of the defendant in the tweet as his tag – I don't know these technical terms but it's his picture. He's

15

been identified by Jahmil T[.] as having the tag name, or whatever you call it, on Twitter as "They Loving it TC." So I think they're properly authenticated by their content and that there were only a few people that would be having the conversation that was depicted on these tweets. So these are coming in.

Harris was convicted of first degree assault and the use of a handgun in the commission of a crime of violence, for which he was sentenced to twenty years' imprisonment. Harris noted a timely appeal to the Court of Special Appeals but before our intermediate appellate court issued an opinion,[27] we granted *certiorari* in *Sublet v. State*, and Harris petitioned this Court to issue a Writ of *Certiorari*, which we granted, to answer the following questions:

> 1. Are one-to-one communications sent through a social networking website, such as direct tweets sent through Twitter, governed by the authentication standard announced in *Griffin v. State*, 419 Md. 343 (2011), or are they excepted from that standard, as announced in footnote 13 of the Griffin opinion, because they are like emails, texts, and instant messages?
>     a. Should there remain a difference in assessing the authentication of evidence derived from social networking websites on the one hand and emails/texts/instant messages on the other, given the identity-separation concern attendant to all those forms of communication?
> 2. If the standard in *Griffin* applies, did the court abuse its discretion in admitting Twitter messages purportedly written by petitioner when no extrinsic evidence connected petitioner to the account or the authorship of the messages?

*Harris v. State*, 440 Md. 114, 99 A.3d 778 (2014).

*Monge-Martinez v. State*

---

[27] The question presented to our intermediate appellate court was:
> 1. Did the court abuse its discretion in admitting Twitter messages purportedly written by Mr. Harris when the State failed to properly authenticate those messages under *Griffin v. State*, 419 Md. 343 (2011)?

16

Carlos Alberto Monge-Martinez, the third Petitioner herein, was charged with attempted second degree murder and two counts each of first degree assault, second degree assault and reckless endangerment arising out of an April 23, 2012 altercation with a former girlfriend, Dorothy Ana Santa Maria, during which Ms. Santa Maria was stabbed. According to the State's theory of the case, Monge-Martinez had intentionally instigated the fight, while Monge-Martinez posited that he was defending himself from Ms. Santa Maria. The State sought to introduce Facebook messages[28] received by Ms. Santa Maria that had allegedly been sent by Monge-Martinez reflecting that he had expressed remorse for his actions.[29]

During Ms. Santa Maria's testimony, the Assistant State's Attorney elicited that she had received Facebook messages, ostensibly from Monge-Martinez. The first Facebook message, State's Exhibit 19, indicated that it had been sent at 4:21 p.m. and was an apology for getting "carried away by the anger":

> **Carlos Monge**
> Monday, April 23 at 4:21 PM
> Sent from Web

---

[28] On Facebook, "Messages" may be sent to any Facebook user and are visible only to the profile to which they were sent. Sending a Message, Facebook.com, https://www.facebook.com/help/326534794098501/ (last visited Apr. 20, 2015).

[29] In the Court of Special Appeals, Monge-Martinez moved to supplement the record with certified translations of the Facebook messages from the original Spanish into English. The motion was granted by the intermediate appellate court, and we utilize those translations in our exposition.

I wish and one day you forgive me. I got carried away by the anger and your deceit. You didn't lie yesterday, you've been ridiculing me for day and you know it's the truth.

The second Facebook message, State's Exhibit 20, showed a date of April 23, in which Monge-Martinez allegedly stated that he "no longer want[s] to live with this":

**Carlos Monge**
Monday, April 23 at [glare[30]] PM
Sent from Web

I do not know what I will do I no longer want to live with this.

The third Facebook message, State's Exhibit 21, indicated that it was received on April 23 at 4:36 PM and admonished Ms. Santa Maria for "deciev[ing]" and "disconcert[ing]" the author of the message:

**Carlos Monge**
Monday, April 23 at 4:36 PM
Sent from Web

I love you but knowing how you deceived me disconcerted me. I hope you are doing well. I love you.

When the State sought to introduce State's Exhibits 19, 20 and 21, which depicted screenshots of Ms. Santa Maria's phone displaying the messages, Monge-Martinez's attorney objected to their admission on the basis that "the State will not be able to show any evidence that's referring to the incident on the 23rd." The trial court permitted the Assistant State's Attorney to question Ms. Santa Maria to establish the authenticity of the Facebook messages.

---

[30] State's Exhibit 20 contained a glare on the page that occluded the timestamp of the photograph.

18

Ms. Santa Maria, thereafter, identified the exhibits as "Facebook messages that [Monge-Martinez] wrote me", which she had received while in the hospital being treated for her injury:

> [STATE'S ATTORNEY]:  Back to when you were in the hospital, you received a couple Facebook messages from [Monge-Martinez]; is that correct?
> [MS. SANTA MARIA]:  Yes, ma'am.
> [STATE'S ATTORNEY]:  Showing you State's Exhibits 19, 20 and 21, you recognize State's 19, 20 and 21?
> [MS. SANTA MARIA]:  Yes, ma'am.
> [STATE'S ATTORNEY]:  What are they?
> [MS. SANTA MARIA]:  They're Facebook messages that he wrote me.

According to Ms. Santa Maria, the Exhibits were screenshots of her phone displaying the Facebook messages, which the trial judge admitted in evidence over objection:

> [STATE'S ATTORNEY]:  Let me ask it this way.  Was there a photograph taken of your phone of the Facebook messages?
> [MS. SANTA MARIA]:  Yes.
> [STATE'S ATTORNEY]:  And is State's 19, 20 and 21 a photograph of your screen from northbound?
> [MS. SANTA MARIA]:  Yes, ma'am.
> [STATE'S ATTORNEY]:  State enters 19, 20 and 21.
> [ATTORNEY FOR MONGE-MARTINEZ]:  Please note our objection.
> THE COURT:  Over objection, admitted.

Monge-Martinez was ultimately found guilty of second degree assault and openly carrying a dangerous weapon with the intent to injure.  He was sentenced to ten years' imprisonment for the assault and three years' imprisonment for carrying a dangerous weapon, to run concurrently.

19

The Court of Special Appeals, in an unreported opinion, affirmed the conviction and sentence, having found no error in the admission of the Facebook messages.[31] We granted Monge-Martinez's Petition for *Certiorari* to answer the following questions:

> 1. Are one-to-one communications sent through a social networking website, such as direct messages sent through Facebook, governed by the authentication standard announced in *Griffin v. State*, 419 Md. 343 (2011), or are they excepted from that standard, under footnote 13 of the *Griffin* opinion, because they are like emails, texts, and instant messages?
>> a. Should there remain a difference in assessing the authentication of evidence derived from social networking websites on the one hand and emails/texts/instant messages on the other, given the fabrication concerns attendant to all those forms of communication?
> 2. Did the trial court abuse its discretion in admitting supposed Facebook messages purportedly written by Petitioner, where the recipient testified only that Petitioner "was on my account" and that photographs of the messages were taken?
> 3. Did the Court of Special Appeals err in deeming harmless any error?

*Monge-Martinez v. State*, 440 Md. 114, 99 A.3d 778 (2014).

**Authentication**

Authentication has been defined as "the act of proving that something (as a document) is true or genuine, esp[ecially] so that it may be admitted as evidence". Black's Law Dictionary 157 (10th ed. 2014). Authentication of a matter prior to its admission "is not an[] artificial principal of evidence, but an *inherent logical necessity*", (7 J. Wigmore, Evidence § 2129 (Chadbourn Rev. 1978)), and is integral to establishing its relevancy. *See*

---

[31] The questions before the Court of Special Appeals were:
> 1. Did the trial court abuse its discretion in propounding a flight instruction?
> 2. Did the trial court abuse its discretion in admitting unauthenticated messages attributed to Appellant and did the trial court err in permitting the complainant to translate the messages?

2 McCormick on Evidence § 221 (7th ed. 2013) ("The proponent's assertion as to why the writing is relevant determines what the proponent claims the writing is, typically that it has some specific connection to a person or organization, whether through authorship or some other relation.  It is this connection that must be proved to authenticate the writing.").

The role of judge as "gatekeeper" is essential to authentication, because of jurors' tendency, "when a corporal object is produced as proving something, to *assume, on sight of the object, all else that is implied in the case* about it", for which Wigmore provided the following example:

> [I]t is easy for a jury, when witnesses speak of a horse being stolen from Doe by Roe, to understand, when Doe is proved to have lost the horse, that it still remains to be proved that Roe took it; the missing element can clearly be kept separate as an additional requirement.  But if the witness to the theft were to have a horse brought into the courtroom, and to point it out triumphantly, "If you doubt me, there is the very horse!", this would go a great way to persuade the jury of the rest of his assertion and to ignore the weakness of his evidence of Roe's complicity.  The sight of the horse, corroborating in the flesh, as it were, a part of the witness' testimony, tends to verify the remainder.

Wigmore, *supra*, § 2129.

We adopted Maryland Rule 5-901,[32] as well as the rest of the Maryland Rules of

Evidence, in 1993, to codify our common law of evidence, (s*ee* 21:1 *Maryland Register* P-

---

[32] As adopted, Maryland Rule 5-901 provided, in pertinent part:
(a) General Provision.
   The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
(b) Illustrations
   By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this Rule:
      (1) Testimony of Witness With Knowledge
         Testimony of a witness with knowledge that the offered evidence is what it is claimed to be.
      (2) Non-Expert Opinion on Handwriting
         Non-expert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.
      (3) Comparison With Authenticated Specimens
         Comparison by the court or an expert witness with specimens that have been authenticated.
      (4) Circumstantial Evidence
         Circumstantial evidence, such as appearance, contents, substance, internal patterns, location, or other distinctive characteristics, that the offered evidence is what it is claimed to be.
21:1 *Maryland Register* P-16 (Jan. 7, 1994). Rule 5-901 was amended, in 1998, to add cross-references to other Maryland Rules not relevant to our discussion here, and has otherwise remained unchanged. *See* 24:2 *Maryland Register* 1543 (Oct. 24, 1997) (One Hundred Thirty-Eighth Report of The Standing Committee on Rules of Practice and Procedure recommending amendment of Rule 5-901 to add cross-references); 25:6 *Maryland Register* 446 (Mar. 13, 1998) (Rules Order adopting amendment to Rule 5-901 proposed in 138th Report of the Rules Committee).

1 (Jan 7, 1994)), which was based upon Federal Rule of Evidence 901,[33] (*see* Court of Appeals of Maryland, Rules Order, 21:1 *Maryland Register* P1).  "[W]e take into account common law principles on the same subject matter when interpreting the rules of evidence set forth in Title 5." *Brooks v. State*, 439 Md. 698, 719, 98 A.3d 236, 248 (2014).  As such, the opportunities and challenges of determining authorship of social networking communications and postings are best understood in the historical context of authentication.  *See* Ira P. Robbins, *Writings on the Wall: The Need for an Authorship-Centric Approach to the Authentication of Social-Networking Evidence*, 13 Minn. J.L. Sci. & Tech. 1, 16-17 (discussing authentication in terms of verifying authorship).

---

[33] Federal Rule of Evidence 901, in 1993, stated, in pertinent part:

(a) General provision.—The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) Illustrations.—By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) Testimony of witness with knowledge.—Testimony that a matter is what it is claimed to be.

(2) Nonexpert opinion on handwriting.—Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.

(3) Comparison by trier or expert witness.—Comparison by the trier of fact or by expert witnesses with specimens which have been authenticated.

(4) Distinctive characteristics and the like.—Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

Fed. R. Evid. 901 (1993).

With respect to the authentication of the authorship of writings,[34] they "purport on their face to be of a certain person's authorship" and, therefore, various approaches have developed "for separating the external evidence of authorship from the mere existence of the purporting document." Wigmore, *supra*, § 2130. The most straightforward approach to authenticating a writing is to ask an individual with personal knowledge about the document whether the matter was what it purported to be. *E.g. Matthews v. J.B. Colt Co.*, 145 Md. 667, 672, 125 A. 840, 841 (1924) (testimony of witness that he saw defendant sign contract was sufficient to warrant its admission). Familiarity with the purported author's signature also has been a basis for authentication, provided that such familiarity was proven prior to authentication. *Smith v. Walton*, 8 Gill 77, 77 (Md. 1849) ("A witness who has seen a party write, or who has corresponded with him, is qualified to speak with respect to the genuineness of his signature.").[35] In other circumstances, comparison to a known exemplar may be accomplished through expert testimony or within the confines of the jury room. *See, e.g.*, *Hoover v. Hoover*, 187 Md. 646, 650, 51 A.2d 166, 168 (1947) ("A bank official, whose business it was to know handwriting, testified as an expert that in his opinion the writing on the disputed note, and the admitted writing of [the alleged author]

---

[34] Social media communications pose similar authentication challenges to writings in the traditional sense, like letters and other documents. *See* 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 901.04[1] (Joseph M. McLaughlin ed., Matthew Bender 2d ed. 2015) (discussing the use of handwriting to authenticate a document as having been signed or written by the alleged author).

[35] Nevertheless, "where there is a genuine issue as to authenticity parties ought endeavor to bolster such testimony with stronger evidence, as by expert testimony". 6A Lynn McLain, *Maryland Evidence—State and Federal* § 901:3 (3d ed. 2013).

on the autographed note, were the same."); *Haile v. Dinnis*, 184 Md. 144, 153-54, 40 A.2d 363, 367 (1944) (jury compared records against previously admitted exemplars to determine if they were authentic). In the absence of known exemplars, authentication of a writing also could be obtained were the contents or subject matter of the writing to "contain circumstantial evidence indicating the identity of its author", (5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 901.04[3][a] (Joseph M. McLaughlin ed., Matthew Bender 2d ed. 2015)), by, for example, containing information known only to a chosen few. *See, e.g.*, *United States v. Sutton*, 426 F.2d 1202, 1208 n.53 (D.C. Cir. 1969). Authentication or proof of authorship of a writing also could be accomplished under the "reply letter doctrine", (6A Lynn McLain, *Maryland Evidence—State and Federal* § 901:5(c) (3d ed. 2013)), which instructed "that where a letter ha[d] been received by the due course of mail in answer to a prior letter of the receiver, with the name of the addressee or such prior letter signed thereto, a presumption [arose] that it [wa]s the letter of the person whose name [wa]s signed thereto." *Am. Bonding Co. of Baltimore v. Ensey*, 105 Md. 211, 65 A. 921, 925 (1907) (internal quotation marks omitted).

As it has been a challenge to authenticate writings, especially in the early period of the Republic,[36] so has been authentication of social networking websites and posts, because traditional opportunities for authentication are reduced by the lack of handwriting, the

---

[36] *See, e.g.*, *Smith v. Easton*, 54 Md. 138, 39 Am. Rep. 355 (1880) (discussing the challenge of authenticating a telegram); *Smith v. Walton*, 8 Gill 77 (Md. 1849) (authentication of a receipt); *Gordon v. Hickman*, 4 H. & McH. 217 (Md. Gen. 1798) (authentication of record books required proof of identity of witnesses who had signed the books).

absence of a physical location of the document and the inherent anonymity provided by posting on websites.  *See generally* Allison Stiles, *Everyone's A Critic: Defamation and Anonymity on the Internet*, 2002 Duke L. & Tech. Rev. 0004 (2002), *available at* http:// scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1045&context=dltr  (last  visited Apr. 20, 2015).

Social networks, which "invite users to establish online profiles through which they can share information", (Ossian, *supra*, § 1:2.1), require the user to register "using a valid e-mail address; first and last names; personal password; country; postal code; date of birth . . . ; and gender", (John G. Browing, The Lawyer's Guide to Social Networking 19 (2010)). Although biographical information is required to establish a social networking profile, "there doesn't appear to be a way to validate such information before a page can be created".  *Id.*  On a social networking website, users may "post their own personal information, photographs and videos" and, from their profiles, "they can send and receive messages to and from others".  2 McCormick, *supra*, § 227.  These messages may be public or private and visible to participants in the conversation.

Social networking material provides the fodder for civil disputes and defenses, as well as proof of violations of criminal laws.  *See, e.g.*, *United States v. Elonis*, 897 F. Supp. 2d 335, 338 (E.D. Pa. 2012), *aff'd*, 730 F.3d 321 (3d Cir. 2013) (Defendant violated federal law prohibiting transmitting interstate communications containing any threat to injure a person by posting threatening comments on Facebook); *State v. Buhl*, 100 A.3d 6, 8-9 (Conn. App. 2014) (Facebook entries received in evidence to show the defendant had harassed the victim); *Moore v. State*, 763 S.E.2d 670, 674 (Ga. 2014) (Defendant's

Facebook posts used to establish guilt for his murder conviction); *Commonwealth v. Foster F.*, 20 N.E.3d 967, 970-71 (Mass. App. Ct. 2014) (Facebook messages between juvenile defendant and victim received in evidence); *State v. McKinley*, 764 S.E.2d 303, 326 (W.Va. 2014) (Facebook evidence received during murder trial).

Authentication of social networking communications and postings has been and continues to be a significant issue. *See* Ossian, *supra*, § 9:7.2 ("The second evidentiary requirement [after relevance]—and the one receiving the most attention—is authentication."); *Griffin*, 419 Md. at 352, 19 A.3d at 421 ("The identity of who generated the profile may be confounding, because 'a person observing the online profile of a user with whom the observer is unacquainted has no idea whether the profile is legitimate.'"), quoting Nathan Petrashek, Comment, *The Fourth Amendment and the Brave New World of Online Social Networking*, 93 Marq. L.Rev. 1495, 1499 n.16 (2009-2010).

Authentication of a profile on a social networking website depends upon whether the profile was created by its purported owner and/or whether a "cracker"[37] had accessed the website. *See* Ossian, *supra*, § 9:7.2 (noting that a major component of the authentication of social networking evidence is "access and control of the social media information"); Lawrence Morales II, *Social Media Evidence: "What You Post or Tweet Can and Will Be Used Against You in a Court of Law*, 60 The Advoc. (Texas) 32, 36 (2012)

---

[37] "A cracker is an individual who attempts to access computer systems without authorization. These individuals are often malicious, as opposed to hackers, and have many means at their disposal for breaking into a system." *Internet Users' Glossary*, IETF 12 (Aug. 1996), https://tools.ietf.org/html/rfc1983 (last visited Apr. 20, 2015).

("It is common for witnesses faced with an incriminating statement on their social media profile to claim that it must have been written by someone else, which they claim is possible because other people know their social media password or use their computer. . . . These unique characteristics of social media websites present authentication challenges for courts and litigants."). Unauthorized access of a profile can occur even without password sharing when an individual remains logged in to his or her account through their cell phone or computer and leaves them unattended, thereby allowing third parties access to the profile. *See State v. Eleck*, 23 A.3d 818, 822 (Conn. App. Ct. 2011), *aff'd on other grounds*, 100 A.3d 817 (Conn. 2014) ("[A]ccount holders frequently remain logged in to their accounts while leaving their computers and cell phones unattended."). Individuals may also obtain unauthorized access to an account by "guessing or finding . . . a valid password". Michael Lee et. al, *Electronic Commerce, Hackers, and the Search for Legitimacy: A Regulatory Proposal*, 14 Berkeley Tech. L.J. 839, 850 (1999); *see generally id.* at 846-50 (presenting an overview of different methods of hacking).

In *Griffin*, 419 Md. at 346-47, 19 A.3d at 417, we had our first occasion to address authentication of social networking evidence. The admission in evidence of a screenshot of a MySpace page of the girlfriend of Griffin, who was on trial for murder, was in issue. The printout of the "screenshot" had been made by the lead investigator of the case, who testified that he had printed it from his computer. Jessica Barber, the girlfriend, had been on the stand as a witness, but had not been questioned regarding her ownership of the profile. The screenshot was relevant, the State proffered, because it showed that Ms. Barber had, prior to trial, threatened a witness to the murder.

28

The screenshot contained a picture "of a person that look[ed] like Jessica Barber", (*id.* at 349, 19 A.3d at 419), and described a twenty-three year-old female from Port Deposit, listing her birthday as "10/02/1983", as well as the statement:

> FREE BOOZY!!!! JUST REMEMBER SNITCHES GET STITCHES!! U KNOW WHO YOU ARE!!

*Id.* at 348, 19 A.3d at 418.

We recognized in *Griffin* that authentication of social networking evidence can pose significant problems, "because anyone can create a fictitious account and masquerade under another person's name or can gain access to another's account by obtaining the user's username and password". *Id.* at 352, 19 A.3d at 421. We rejected the mere printout of the screenshot in issue as authentic, because the lead investigator, who had created the document, lacked any knowledge about ownership of or who created the profile.

We suggested, however, under Rules 5-901(b)(1) and (4), three <u>non-exclusive</u> means of authentication of ownership of such websites. The first and most obvious method for authentication, we said, "would be to ask the purported creator if she indeed created the profile and also if she added the posting in question". *Id.* at 363, 19 A.3d at 427. The second approach we discussed was to "search the computer of the person who allegedly created the profile and posting and examine the computer's internet history and hard drive to determine whether that computer was used to originate the social networking profile and posting in question." *Id.* The third of the non-exhaustive means of authentication we suggested was to "obtain information directly from the social networking website", which

29

would link together the profile and the entry to the person, or persons, who had created them. *Id.* at 364, 19 A.3d at 428.[38]

In the period since *Griffin* had been decided, cases in which authentication of social networking websites and postings has been addressed have proliferated.[39] In the shadow

---

[38] We also suggested in *Griffin*'s footnote thirteen that a public posting on a social networking page differs from private messages visible to specified individuals with respect to authentication. E-mails and other directed communications, for example, may present a greater opportunity for authentication by circumstantial evidence. *See Griffin*, 419 Md. at 361 n.13, 19 A.3d at 426 n.13 (citing numerous cases).

[39] *See, e.g.*, *United States v. Brinson*, 772 F.3d 1314 (10th Cir. 2014) (authentication of Facebook messages); *United States v. Vayner*, 769 F.3d 125 (2d Cir. 2014) (authentication of posts on VK.com, a Russian equivalent of Facebook); *United States v. Hassan*, 742 F.3d 104 (4th Cir.), *cert. denied sub nom. Sherifi v. United States*, 573 U.S. __, 134 S. Ct. 2737, 189 L. Ed. 2d 774 (2014), *and cert. denied*, 574 U.S. __, 135 S. Ct. 157, 190 L. Ed. 2d 115 (2014), *and cert. denied sub nom. Yaghi v. United States*, 574 U.S. __, 135 S. Ct. 192, 190 L. Ed. 2d 115 (2014) (authentication of Facebook post); *United States v. Adams*, 722 F.3d 788, 821 (6th Cir. 2013) (authentication of MySpace message); *United States v. Lebowitz*, 676 F.3d 1000 (11th Cir. 2012) (authentication of MySpace messages); *Juror No. One v. Superior Court*, 142 Cal. Rptr. 3d 151 (Cal. Ct. App. 2012) (authentication of Facebook post); *Connecticut v. Eleck*, 23 A.3d 818 (Conn. App. Ct. 2011) (authentication of Facebook messages), *aff'd on other grounds*, 100 A.3d 817 (Conn. 2014); *Parker v. State*, 85 A.3d 682 (Del. 2014) (authentication of Facebook posts); *Moore v. State*, 763 S.E.2d 670 (Ga. 2014) (authentication of Facebook posts); *Stapp v. Jansen*, 988 N.E.2d 234 (Ill. App. 2013) (authentication of MySpace and Facebook messages); *State v. Raskie*, 269 P.3d 1268 (Kan. 2012) (authentication of MySpace messages); *Commonwealth v. Foster F.*, 20 N.E.3d 967 (Mass. App. Ct. 2014) (authentication of Facebook messages); *Smith v. State*, 136 So. 3d 424 (Miss. 2014) (authentication of Facebook messages); *State v. Snow*, 437 S.W.3d 396 (Mo. Ct. App. 2014) (authentication of MySpace message); *State v. Paster*, 15 N.E.3d 1252 (Ohio Ct. App. 2014) (authentication of Facebook posts); *State v. Nance*, 393 S.W.3d 212 (Tenn. Crim. App. 2012) (authentication of MySpace posts); *Campbell v. State*, 382 S.W.3d 545 (Tex. App. 2012) (authentication of Facebook messages); *Tienda v. State*, 358 S.W.3d 633 (Tex. Crim. App. 2012) (authentication of MySpace profile); *State v. Lawrence*, 80 A.3d 58 (Vt. 2013) (authentication of MySpace profile).

of *Griffin*, we today are asked to cull the various cases to discern a standard for authentication of social networking evidence. In so doing, we find succor in the standard articulated by the United States Court of Appeals for the Second Circuit in *United States v. Vayner*, 769 F.3d 125 (2014), which, on facts analogous to those in *Griffin*, reached a similar conclusion.

In *Vayner*, Aliaksandr Zhyltsou was charged with the transfer of a false identification document. *Id.* at 127. The government's primary witness against Zhyltsou, Vladyslav Timku, testified that he "was familiar with Zhyltsou's work as a forger because he had previously paid Zhyltsou to create false" documents. *Id.* According to Timku, Zhyltsou had sent him the completed forgery via e-mail from the address, "fromazmadeuz@gmail.com". *Id.* However, "near the conclusion of the prosecution's case, only Timku's testimony directly connected Zhyltsou with the [e-mail] address". *Id.* at 127-28.

The government, before resting, indicated to the district court that it planned to call an unexpected final witness, Special Agent Robert Cline of the State Department's Diplomatic Security Service. *Id.* at 128. According to the government, it would "introduce a printout of a web page that the government claimed to be Zhyltsou's profile on VK.com ('VK'), which Special Agent Cline described as 'the Russian equivalent of Facebook.'" *Id.*

Zhyltsou objected to the admissibility of the printout on the grounds that it had not been properly authenticated under Federal Rule of Evidence 901. The district court overruled Zhyltsou's objection, finding that the VK page was, in fact, Zhyltsou's VK page

and there was "'no question about the authenticity of th[e] document so far as it's coming off the Internet now.'" *Id.*

As summarized in the opinion of the Second Circuit, Special Agent Cline then testified with respect to the VK page:

> During his testimony, Special Agent Cline identified the printout as being from "the Russian equivalent of Facebook." He noted to the jury that the page purported to be the profile of "Alexander Zhiltsov" (an alternate spelling of Zhyltsou's name), and that it contained a photograph of Zhyltsou. Importantly for the government's case, Special Agent Cline next pointed out that under the heading, "Contact Information," the profile listed "Azmadeuz" as "Zhiltsov's" address on Skype (a service that Special Agent Cline described as a "voiceover IP provider"). The web page also reflected that "Zhiltsov" worked at a company called "Martex International" and at an Internet café called "Cyber Heaven," which corresponded with Timku's earlier testimony that Zhyltsou and Timku had both worked for those entities. On cross-examination, Special Agent Cline admitted that he had only a "cursory familiarity" with VK, had never used the site except to view this single page, and did not know whether any identity verification was required in order for a user to create an account on the site.

*Id.* at 128-29.

The Second Circuit recognized that, initially, authentication of the VK page was in issue:

> "The requirement of authentication is . . . a condition precedent to admitting evidence." [*United States v.* ]*Sliker*, 751 F.2d [477,] 497; *see also United States v. Maldonado–Rivera*, 922 F.2d 934, 957 (2d Cir.1990) ("In general, a document may not be admitted into evidence unless it is shown to be genuine."). Rule 901 of the Federal Rules of Evidence governs the authentication of evidence and provides, in pertinent part: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed.R.Evid. 901(a).

*Id.* at 129. The Second Circuit instructed that, "'[t]his requirement is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or

32

identification.'" *Id.* at 129-30, quoting *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir.1999) (internal quotation marks omitted). Thereafter, the jury ultimately is left to make the "determination as to whether the evidence is, in fact, what its proponent claims". *Id.* at 130, citing *Sliker*, 751 F.2d at 499.

Under the standard articulated in *Vayner*, the preliminary determination of authentication must be made by the trial judge and "depends upon a context-specific determination whether the proof advanced is sufficient to support a finding that the item in question is what its proponent claims it to be", (*id.*), based upon "sufficient proof . . . so that a reasonable juror could find in favor of authenticity or identification", (*id.* quoting *Pluta*, 176 F.3d at 49):

> Rule 901 "does not definitively establish the nature or quantum of proof that is required" preliminarily to authenticate an item of evidence. [*Sliker*, 751 F.2d] at 499. "The type and quantum of evidence" required is "related to the purpose for which the evidence is offered," *id*. at 488, and depends upon a context-specific determination whether the proof advanced is sufficient to support a finding that the item in question is what its proponent claims it to be. We have said that "[t]he bar for authentication of evidence is not particularly high." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir.2007). But even though "[t]he proponent need not rule out all possibilities inconsistent with authenticity, or . . . prove beyond any doubt that the evidence is what it purports to be," *id*. (internal quotation marks omitted), there must nonetheless be at least "sufficient proof . . . so that a reasonable juror could find in favor of authenticity or identification," *Pluta*, 176 F.3d at 49 (internal quotation marks omitted).
> The "proof of authentication may be direct or circumstantial." *United States v. Al–Moayad*, 545 F.3d 139, 172 (2d Cir.2008). The simplest (and likely most common) form of authentication is through "the testimony of a 'witness with knowledge' that 'a matter is what it is claimed to be.'" *United States v. Rommy*, 506 F.3d 108, 138 (2d Cir.2007) (quoting Fed.R.Evid. 901(b)(1) (pre-2011 amendments)). This is by no means exclusive, however: Rule 901 provides several examples of proper authentication techniques in different contexts, *see* Fed.R.Evid. 901(b), and the advisory committee's note states that these are "not intended as an exclusive enumeration of

33

allowable methods but are meant to guide and suggest, leaving room for growth and development in this area of the law," Fed.R.Evid. 901 advisory committee's note (Note to Subdivision (b)).

*Id.* (footnote omitted). Illustration of authentication techniques, according to the Second Circuit, could be derived from documents:

> Some examples illustrate the point. For instance, we have said that a document can be authenticated by "distinctive characteristics of the document itself, such as its '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances.'" *Maldonado–Rivera*, 922 F.2d at 957 (alteration in original) (quoting Fed.R.Evid. 901(b)(4) (pre-2011 amendments)); *see also Sliker*, 751 F.2d at 488 (contents of alleged bank records, in conjunction with their seizure at purported bank office, provided sufficient proof of their connection to allegedly sham bank). Or, where the evidence in question is a recorded call, we have said that "[w]hile a mere assertion of identity by a person talking on the telephone is not in itself sufficient to authenticate that person's identity, some additional evidence, which need not fall into any set pattern, may provide the necessary foundation." [*United States v.*] *Dhinsa*, 243 F.3d [635,] 658-59 (brackets and internal quotation marks omitted); *see also Sliker*, 751 F.2d at 499 (voice on tape recording was sufficiently authenticated as defendant's based on comparison of taped voice with defendant's trial testimony). And in a case where credit card receipts purportedly signed by the defendant would have tended to support his alibi defense, we ruled that the defendant's copies had been sufficiently authenticated, despite some question as to when these copies had been signed, where the defendant offered testimony from store managers as to how the receipts were produced, testimony from the defendant's wife (a joint holder of the credit card) that she had not made the purchases in question, and testimony from a handwriting expert that the defendant's signature was genuine. *United States v. Tin Yat Chin*, 371 F.3d 31, 35-38 (2d Cir.2004).

*Id.* at 130-31 (footnote omitted). The Second Circuit, finally, iterated that even after

34

evidence is authenticated, "'the issue of [its] ultimate reliability [is left] to the jury."[40] *Id.*

at 131, quoting *United States v. Tropeano*, 252 F.3d 653, 661 (2d Cir. 2001):

> As we have said, "[a]uthentication of course merely renders [evidence] admissible, leaving the issue of [its] ultimate reliability to the jury." *United States v. Tropeano*, 252 F.3d 653, 661 (2d Cir. 2001). Thus, after the proponent of the evidence has adduced sufficient evidence to support a finding that the proffered evidence is what it is claimed to be, the opposing party "remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the *weight* of the evidence—not to its *admissibility*." *Tin Yat Chin*, 371 F.3d at 38.

*Id.*

The court, however, "conclude[d] that the district court abused its discretion in admitting the VK web page". *Id.* It reasoned "that information *about* Zhyltsou appeared on the VK page . . . . But there was no evidence that Zhyltsou himself had created the page or was responsible for its contents." *Id.* at 132. The court opined, moreover, that the mere fact that the page existed on the internet "does not permit a reasonable conclusion that [it] was created by the defendant or on his behalf":

---

[40] In footnote fifteen of *Griffin*, 419 Md. at 365 n.15, 19 A.3d at 428 n.15, we cited *Lorraine v. Markel Am. Insurance Co.*, 241 F.R.D. 534, 539-40 (D.Md. 2007), which explained "conditional relevance":

> In essence, determining whether [electronically stored information] is authentic, and therefore relevant, is a two step process. First, "[b]efore admitting evidence for consideration by the jury, the district court must determine whether its proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." Then, "because authentication is essentially a question of conditional relevancy, the jury ultimately resolves whether evidence admitted for its consideration is that which the proponent claims."

*Id.*, quoting *United States v. Branch*, 970 F.2d 1368, 1370-71 (4th Cir. 1992) (footnotes omitted).

35

As noted above, Rule 901 requires "evidence sufficient to support a finding that the item is what the proponent claims it is." It is uncontroverted that information *about* Zhyltsou appeared on the VK page: his name, photograph, and some details about his life consistent with Timku's testimony about him. But there was no evidence that Zhyltsou himself had created the page or was responsible for its contents. Had the government sought to introduce, for instance, a flyer found on the street that contained Zhyltsou's Skype address and was purportedly written or authorized by him, the district court surely would have required some evidence that the flyer did, in fact, emanate from Zhyltsou. Otherwise, how could the statements in the flyer be attributed to him? *Cf. Dhinsa*, 243 F.3d at 658-59 ("[A] mere assertion of identity by a person talking on the telephone is not in itself sufficient to authenticate that person's identity . . . ."). And contrary to the government's argument, the mere fact that a page with Zhyltsou's name and photograph happened to exist on the Internet at the time of Special Agent Cline's testimony does not permit a reasonable conclusion that this page was created by the defendant or on his behalf.

*Id.* The page could not be authenticated by "distinctive characteristics", the Second Circuit continued, because "all the information contained on the VK page allegedly tying the page to Zhyltsou was also known by Timku and likely others, some of whom may have had reasons to create a profile page falsely attributed to the defendant":

It is true that the contents or "distinctive characteristics" of a document can sometimes alone provide circumstantial evidence sufficient for authentication. Fed. R. Evid. 901(b)(4). For example, a writing may be authenticated by evidence "that the contents of the writing were not a matter of common knowledge." *Maldonado–Rivera*, 922 F.2d at 957 (brackets and internal quotation marks omitted). Here, however, all the information contained on the VK page allegedly tying the page to Zhyltsou was also known by Timku and likely others, some of whom may have had reasons to create a profile page falsely attributed to the defendant. Other than the page itself, moreover, no evidence in the record suggested that Zhyltsou even had a VK profile page, much less that the page in question was that page. Nor was there any evidence that identity verification is necessary to create such a page with VK, which might also have helped render more than speculative the conclusion that the page in question belonged to Zhyltsou.

*Id.* at 132-33.

The Second Circuit, however, demurred from expressing a "view on what kind of evidence *would* have been sufficient to authenticate the VK page", because the "evidence necessary to authenticate a web page will always depend on context":

> We express no view on what kind of evidence *would* have been sufficient to authenticate the VK page and warrant its consideration by the jury. Evidence may be authenticated in many ways, and as with any piece of evidence whose authenticity is in question, the "type and quantum" of evidence necessary to authenticate a web page will always depend on context. *Sliker*, 751 F.2d at 488. Given the purpose for which the web page in this case was introduced, however—to corroborate Timku's testimony that it was Zhyltsou who used the moniker "azmadeuz" for the [e-mail] address from which the forged birth certificate was sent—Rule 901 required that there be *some* basis beyond Timku's own testimony on which a reasonable juror could conclude that the page in question was not just any Internet page, but in fact *Zhyltsou's* profile. No such showing was made and the evidence should therefore have been excluded.

*Id.* at 330.

The standard articulated in *Vayner*, which we embrace, is utilized by other federal and State courts addressing authenticity of social media communications and postings. *See, e.g.*, *United States v. Hassan*, 742 F.3d 104, 133 (4th Cir.), *cert. denied sub nom. Sherifi v. United States*, 573 U.S. __, 134 S. Ct. 2737, 189 L. Ed. 2d 774 (2014), *and cert. denied*, 574 U.S. __, 135 S. Ct. 157, 190 L. Ed. 2d 115 (2014), *and cert. denied sub nom. Yaghi v. United States*, 574 U.S. __, 135 S. Ct. 192, 190 L. Ed. 2d 115 (2014) ("Importantly, the burden to authenticate under Rule 901 is not high . . . a district court's role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." (citations omitted)); *Parker v. State*, 85 A.3d 682, 688 (Del. 2014) ("Thus, the trial judge as the gatekeeper of evidence may admit the social media post when there is evidence sufficient to support a

37

finding by a reasonable juror that the proffered evidence is what its proponent claims it to be." (internal quotations marks and footnote omitted)); *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012) ("The preliminary question for the trial court to decide is simply whether the proponent of the evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence he has proffered is authentic.").

**We Affirm**

*Sublet v. State*

Sublet, our first Petitioner, argues that "[Ms. Parker's] testimony sufficiently authenticated" the four pages allegedly representative of her public Facebook conversation in which she purportedly expressed acrimony towards Ms. Conner. Sublet avers, moreover, that the Facebook posts contained distinctive characteristics from which to confirm their authenticity. The State asserts, conversely, that, Ms. Parker denied making the comments on the fourth page of the exhibit and, therefore, those posts were not authenticated. We agree with the State.

Ms. Parker denied authoring the public posts on page four of Defense Exhibit A, after having admitted to writing the earlier communications in the Exhibit. We already have expressed that when a witness denies having personal knowledge of the creation of the item to be authenticated, that denial necessarily undercuts the notion of authenticity. *See Makowski v. Mayor & City Council of Baltimore*, 439 Md. 169, 197, 94 A.3d 91, 108 (2014) ("[The witness], however, testified that he had never seen the document before nor recognized it. Accordingly, [the opposing party] failed to authenticate the document."); *Cf.* Maryland Rule 5-901(b)(1). As we have said, Sublet's counsel, then, was "bound by

38

the answer of the witness".[41] *Smith v. State*, 273 Md. 152, 157, 328 A.2d 274, 277 (1974). Sublet's argument that Ms. Parker's credibility was for the jury to determine misses the mark, because her denial of authenticity of the page undermined its admissibility.

The evidence before the trial judge also lacked "other distinctive characteristics[] that the offered evidence [was] what it [was] claimed to be." *See* Maryland Rule 5-901(b)(4). Ms. Parker, significantly, testified that she "[gave] her logout name and password to other people" who would access her "page and [write] stuff on there". Testimony that others not only had access to Ms. Parker's Facebook profile, but would regularly write posts under her name undermines her authorship. The last page, as well as the preceding three, were devoid of unique characteristics. It is unclear, facially, that the entries on page four were part of the conversation initiated on page one. The initial post, purportedly by "Chanica DatBytch Brown", was made on "Saturday" at an undisclosed time. Two responses are received to the Brown post, one by "CanDii SoSeductive P" and one from "Camerin Kill'Ent Johnson", before Ms. Parker's initial response, also on "Saturday", at "15:42". Ms. Parker responded again four and a half hours later at "20:27" on "Saturday". The second page, with only one post, was authored by "Zaquane Graham" on "Yesterday" at "18:42", and contained no discernable reference to the conversation from "Saturday". On the third page, there are no messages from Ms. Parker's account, "Cece Parker"; instead, the page contains a conversation among Ms. Brown, "Zaquane Graham"

---

[41] "The rule preventing impeachment of a witness by extrinsic evidence on a collateral matter is aimed at preventing inconvenience, loss of time, unfair surprise to the witness and confusion of the issues". *Smith v. State*, 273 Md. 152, 159, 328 A.2d 274, 278 (1974).

and "Tonisha Brown" from "Yesterday". On the fourth page, two posts are attributed to "Cece Parker" from "Yesterday" that follow an hour after a nonsensical post by Ms. Brown and make no reference to the circumstances underlying this case. The "Cece Parker" posts on the fourth page are disconnected entirely from the posts on the first page that Ms. Parker had claimed ownership of, because it is unclear when "Yesterday" was in relation to "Saturday"[42] and, moreover, the "Cece Parker" posts do not refer to nor answer any of the previous messages. No showing was made from which a reasonable juror could have found the pages to be authentic and we, therefore, find no error in the trial judge refusing to admit Defense Exhibit A in evidence.[43]

*Harris v. State*

In *Harris*, the Petitioner asserts that there was insufficient evidence presented for the jury to find that "direct messages" sent through Twitter by the profile "TheyLovingTc" in response to messages from "OMGitsLOCO" that referenced "aveng[ing] keon", were written by him. Harris further urges that Detective Grimes, the State's forensics expert who examined the cell phones, could only trace the messages authored by "OMGitsLOCO" to the iPhone, but that there was no evidence presented with respect to the source of the entries authored by "TheyLovingTc". Harris, finally, asserts that the messages did not

---

[42] The handwritten note across the top of the four pages, "printed on 10·30·12 from Facebook", was never authenticated.

[43] We would note that the Connecticut intermediate appellate court, in *State v. Eleck*, 23 A.3d 818, 824 (Conn. App. Ct. 2011), *aff'd on other grounds*, 100 A.3d 817 (Conn. 2014), determined that a Facebook message was not properly authenticated when the witness admitted that the messages in issue were from her Facebook account, but that she had not authored them and that a "cracker" had accessed her account.

contain distinctive characteristics, because a number of individuals were aware of the fight in which Keon was punched.

The State asserts, conversely, that there were sufficient distinctive characteristics from which the trial judge could determine that a reasonable juror could find the "direct messages" and tweets authentic; to wit, that Jahmil T. had identified "TheyLovingTc" as Harris's Twitter name and that the photographs accompanying the TheyLovingTc messages were of Harris. The State also posits that the content of the messages indicates that Harris was their author, including that they demonstrated that "OMGitsLOCO and TheyLovingTc knew about the plan for a shooting." We agree with the State.

The substance of the conversation referenced a plan to "avenge keon" that had only just been created in response to events occurring that same day. That the plan subsequently came to fruition the following day also indicates that the "direct messages" were written by someone with knowledge of and involvement in the situation, which involved only a small pool of individuals, as Jahmil T. stated:

> [STATE'S ATTORNEY]: Okay. Now, after you were at the metro station, and you heard Kev -- I'm sorry, you heard Jared say this about robbing Kevin, where, if anywhere, did you all go?
> [JAHMIL T.]: We went to Josh's place?
> * * *
> [STATE'S ATTORNEY]: And who was at Josh's place?
> [JAHMIL T.]: Me, [Harris], Kevin, Keon, Josh, Amine, and Foulke.
> * * *
> [STATE'S ATTORNEY]: Okay. And what, if anything, at Josh's place, did Kevin say?
> [JAHMIL T.]: He said he was going to shoot him.
> * * *
> [STATE'S ATTORNEY]: Did -- were other people -- what, if anything, were other people going to do?

41

[JAHMIL T.]: They didn't want to do nothing. They were like, "We're not in this. This is y'all two."
[STATE'S ATTORNEY]: And when you say "y'all two," what two people?
[JAHMIL T.]: Kevin and [Harris].

In addition, the "direct messages" conversation occurred from 8:53 to 10:16 on the same evening the plan had been concocted in which one of the participants had used the Twitter username identified as belonging to Harris. From these facts, the trial judge could have determined a reasonable juror would have found that the "direct messages" were authentic.

With respect to the public tweets, our Rule 5-901(b)(3) provides, as an illustrative means of authentication, that an item may be authenticated through comparison "with specimens that have been authenticated." Here, the trial judge had already determined that the "direct messages" associated with "TheyLovinTc" were authored by Harris and were, therefore, authentic. The "tweets", offered in evidence immediately after the trial judge's determination that the "direct messages" were authentic, were authored during the timeframe of the "direct message" conversation, also by "TheyLovinTc". The first of the "tweets" was accompanied by a timestamp of "10:14PM, 17 May 12", two minutes after the "direct message" from "TheyLovingTc" at 10:12PM. The second "tweet" was authored at 10:26PM, ten minutes after the last of the "direct messages" from "OMGitsLOCO". Based upon the temporal proximity of the "tweets" to the "direct messages" that had already been authenticated, a reasonable juror could have found that the "tweets" were also

authentic and, therefore, the trial judge did not abuse her discretion by receiving the "tweets" in evidence.[44]

### *Monge-Martinez v. State*

Monge-Martinez asserts that the State had failed to establish that the remorseful Facebook messages Ms. Santa Maria had received while being treated for stab wounds allegedly inflicted by Monge-Martinez were authored by him. Monge-Martinez argues that there was no identifying information from the Facebook profile, such as date of birth, nor was there testimony to connect him to the authorship of the messages and, therefore, the Facebook messages could not have been authenticated. The State argues that there was circumstantial evidence connecting Monge-Martinez to the messages, because Ms. Santa Maria, who dated him for a year, could attest that he wrote the messages and that "the date and time stamps indicat[ed] they were sent soon after the stabbing, . . . were written in Spanish and alluded to the stabbing." We agree with the State.

With respect to Monge-Martinez's assertion that the messages could not have been authenticated as coming from Facebook or from an account he had created, Ms. Santa Maria testified that the messages were, in fact, "Facebook messages" and that "he was on [her] account". The lack of biographical information, such as Monge-Martinez's date of

---

[44] Detective Grimes's testimony served to confirm that the "direct messages" had been sent and received at the times indicated on the exhibits. The Detective's testimony, however, would not have sufficed for the second means of authentication we described in *Griffin*, because Detective Grimes's report was derived from the recipient of Harris's message, not from "the [cell phone] of the person who allegedly created the profile and posting". *Griffin*, 419 Md. at 363, 19 A.3d at 427.

birth, does not, by itself, prevent authentication, because the inquiry is context-specific; what may be present, yet insufficient, in one case may not be required in another situation.[45]

Whether the messages were actually authored by Monge-Martinez could also be determined by the distinct characteristics of the messages in this context. *See* Maryland Rule 5-901(b)(4). The messages were received shortly after the stabbing at a time when few people were aware of the incident,[46] were written in Spanish (Monge-Martinez's mother tongue) and expressed remorse for "getting carried away by the anger". After receiving the Facebook messages, Monge-Martinez also had contacted Ms. Santa Maria. According to Ms. Santa Maria, "[Monge-Martinez] started calling [her] on the phone" after sending the messages and, upon returning home from the hospital on the day of the stabbing, she discovered a note Monge-Martinez had left in her apartment that was also written in Spanish. Ms. Santa Maria, finally, described a letter she had received from Monge-Martinez "in May of 2012" following the April 23rd incident in which he sought her forgiveness, which was written in Spanish as well. The various communications from Monge-Martinez, together with the limited number of people knowledgeable of the

---

[45] As the Second Circuit Court of Appeals in *Vayner* observed, information about the purported creator of the account is not indicative that the individual had actually created the account. *Vayner*, 769 F.3d at 132 ("It is uncontroverted that information *about* Zhyltsou appeared on the VK page . . . [b]ut there was no evidence that Zhyltsou himself had created the page".).

[46] According to trial testimony, Monge-Martinez, Ms. Santa Maria, her boyfriend, her two neighbors and emergency responders were the only people aware of the stabbing.

44

incident as well as the use of Spanish in each message was sufficient evidence upon which the trial judge could rely to authenticate the Facebook messages.

Monge-Martinez's attempt to analogize his case to *Smith v. State*, 136 So.3d 424 (Miss. 2014), is unavailing. In *Smith*, "[t]he only information tying the actual messages to Smith was [the witness's] testimony that they were Smith's messages to her." *Id.* at 434. As we have explained, any authenticity determination is context-specific and in the case *sub judice* there is far more circumstantial evidence of Monge-Martinez's authorship than a bare assertion that he was the author.

## Conclusion

We hold that, in order to authenticate evidence derived from a social networking website, the trial judge must determine that there is proof from which a reasonable juror could find that the evidence is what the proponent claims it to be. We hold in *Sublet* that the trial court did not err in excluding the admission of the four pages of the Facebook conversation. We hold in *Harris* that the trial court did not err in admitting the "direct messages" and "tweets" in evidence. We also hold in *Monge-Martinez* that the trial court did not err in admitting the Facebook messages authored by Monge-Martinez.

**IN CASE NUMBER 42, JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

**IN CASE NUMBER 59, JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY**

45

**COUNTY AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

**IN CASE NUMBER 60, JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

No. 42 - Circuit Court for Anne Arundel
County, Maryland
Criminal No. K-2012-002287
Argued: February 6, 2015
No. 59 - Circuit Court for Montgomery
County, Maryland
Criminal No. 121279
Argued: February 6, 2015
No. 60 - Circuit Court for Prince
George's County, Maryland
Case No. CT120824X
Argued: February 6, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 42
September Term, 2014

Albert Sublet, IV v. State of Maryland

No. 59
September Term, 2014

Tavares D. Harris v. State of Maryland

No. 60
September Term, 2014

Carlos Alberto Monge-Martinez v. State
of Maryland

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,
JJ.

Concurring and Dissenting Opinion by
Adkins, J., which Barbera, C.J. and
Harrell, J., join.

Filed: April 23, 2015

I join the Majority opinion with respect to *Harris v. State* and *Monge-Martinez v. State*. Respectfully, though, I dissent because I disagree with the Majority's application of the "reasonable juror" standard it adopts, when it comes to authentication in *Sublet v. State*.

The Majority adopts a standard recently applied in *United States v. Vayner*, 769 F.3d 125 (2d Cir. 2014)—that the authentication "requirement is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." Maj. Slip Op. at 32–33 (quoting *Vayner*, 769 F.3d at 129–30). Under this standard, preliminary determination about authentication is made by the trial judge as to whether "'the proof advanced is sufficient to support a finding that the item in question is what its proponent claims it to be' based upon 'sufficient proof . . . so that a reasonable juror could find in favor of authenticity or identification.'" *Id.* at 33 (alteration in Maj. Op.) (quoting *Vayner*, 769 F.3d at 130). The Majority recognized that under the *Vayner* standard, "**the bar for authentication of evidence is not particularly high**." *Id.* (emphasis added) (quoting *Vayner*, 769 F.3d at 130). Significantly, the Majority adopts the *Vayner* rule that "'proof of authentication may be direct or circumstantial.'" *Id.* (quoting *Vayner*, 769 F.3d at 130).

In *Harris*, the Majority allows to stand the admission of direct messages sent through Twitter from "TheyLovingTc" based on authentication by circumstantial evidence—that the twitter message "referenced a plan to 'avenge Keon' that had only just been created in response to events occurring that same day" and that the plan "came to fruition the following day." *Id.* at 41. Yet in *Sublet*, the Majority rejects the combination of direct and circumstantial evidence as insufficient, concluding that "[n]o showing was

made from which a reasonable juror could have found the pages [of Defense Exhibit A] to be authentic." *Id.* at 40. I disagree and think the Majority fails, in its disposition of the *Sublet* case, to adhere to the relatively low threshold for admissibility that it adopts and applies to authentication issues in *Harris*. I submit that the circumstantial evidence in *Sublet*, although different from that in *Harris*, was also sufficient to pass the preliminary, low threshold test necessary to authenticate the Facebook conversation.

The Majority finds the authenticating evidence offered by the defense in *Sublet* insufficient on two principal grounds. First, the Majority holds that because Ms. Parker, the authenticating witness, denied authoring the Facebook comments on page four of Defense Exhibit A (the "Exhibit"), that "undermined its admissibility," *id.* at 39, even though Ms. Parker admitted posting comments on page one.

The Majority relies on *Makowski v. Mayor & City Council of Baltimore*, 439 Md. 169, 94 A.3d 91 (2014), to justify its inconsistent standard, concluding that "when a witness denies having personal knowledge of the creation of the item to be authenticated, that denial necessarily undercuts the notion of authenticity." Maj. Slip Op. at 38 ("'[The witness], however, testified that he had never seen the document before nor recognized it. Accordingly, [the opposing party] failed to authenticate the document.'" (alterations in Maj. Op.) (quoting *Makowski*, 439 Md. at 197, 94 A.3d at 108)).

*Makowski* fails to sustain the Majority's conclusion. Unlike *Sublet*, at no point did the *Makowski* witness who was questioned about the authenticity of the document admit that he authored it. *See* 439 Md. at 197, 94 A.3d at 108. In *Sublet*, before later repudiating her authorship of the comments on page four, Ms. Parker admitted that she "said those

2

things," without qualifying her response as referring to only the first three pages of the Exhibit. Based on this testimony, a reasonable juror could find that all four pages were authentic. Although Ms. Parker later denied she authored the comments on page four, it is the province of the jury to resolve conflicting testimony. *See Balt. Transit Co. v. State for Use of Castranda*, 194 Md. 421, 433, 71 A.2d 442, 446–47 (1950); *Dir. Gen. of Railroads v. State*, 135 Md. 496, 504, 109 A. 321, 324 (1920) ("It was for the jury of course to pass upon the conflicting testimony . . . ."). Moreover, as explained below, circumstantial evidence supported the authenticity of page four.

The Majority rejects this circumstantial evidence as insufficient to meet the standard of Maryland Rule 5-901(b)(4). Maj. Slip Op. at 39–40. Addressing whether page four contains "other distinctive characteristics," the Majority concludes that Ms. Parker's two comments on that page "are disconnected entirely from the posts on the first page that Ms. Parker had claimed ownership of," and "[i]t is unclear, facially, that the entries on page four were part of the conversation initiated on page one." *Id.* The Majority misses the mark by ignoring that the contents and substance of the entries on page four relate directly to the entries on pages one through three.

Maryland Rule 5-901(b)(4) provides that in addition to "other distinctive characteristics," "contents" and "substance" can provide circumstantial evidence sufficient to support a finding of authenticity. On page one, "Chanica Datbytch Brown" initiated the conversation by posting an entry referring to the fight that occurred "last[ ]night" and stating that Ymani Conner, Sublet's girlfriend, has "more to come." Ms. Parker then joined the conversation by commenting, "yea everytime i see that bitch ima fuck that dirty pussy

3

bitch up . shout out to cam cam u was riden." On page three, Ms. Brown continued to discuss her animosity toward Ms. Conner and Sublet when she posted, "She still tawkn shit mmmhm but u want to block me u not real ymani **Conner** u can keep hiding u an ya broke ass man that jus started working at bed bath an beyond out in the mall we will find yal or shuld i say u cuz he goin jail . . . ." (Emphasis added.)

On page four, Ms. Parker made two entries: (1) "ima say this [ain't] over #fact"; and (2) "her bf[1] is a dead man walkn." A reasonable juror could certainly find that in the first post, the "this" in "this [ain't] over" refers to the altercation with and animosity toward Ms. Conner and Sublet that Ms. Parker, Ms. Brown, and others discussed on the previous three pages. A reasonable juror could also find that "her [boyfriend]" in the second post refers to Sublet, and that "is a dead man walk[ing]" is another reference to Ms. Parker's animosity toward Ms. Conner and Sublet. If we step back and put ourselves in the jury box, can we say that we would be unreasonable if we concluded that not only did Ms. Parker author the posts under her profile that appear on page one, but that she continued the conversation as shown on page four of the print-out? My answer is that it would be entirely reasonable to draw that conclusion, and moreover, that it would be the unusual juror who would **not** draw that conclusion.

Several other states have already adopted this standard, and a Delaware case is especially instructive. In *Parker v. State*, 85 A.3d 682 (Del. 2014), the Delaware Supreme Court was also tasked with determining whether a reasonable juror could find Facebook

---

[1] "Bf" is shorthand for "boyfriend." Urban Dictionary, http://www.urbandictionary.com/define.php?term=bf (last visited April10, 2015).

entries authentic.  *Id.* at 682–83.  Following a physical altercation between Tiffany Parker and Sheniya Brown, the state of Delaware charged Parker with second degree assault.  *Id.* at 683.  To demonstrate Parker's role in the altercation and discredit her self-defense argument, the state sought to introduce Facebook entries that Parker allegedly authored after the altercation.  *Id.*  The trial court found that based on circumstantial evidence and Brown's testimony, the state sufficiently authenticated the post.  *Id.* at 684.

Affirming the trial court, the Supreme Court first addressed the circumstantial evidence proffered by the state, observing that "the substance of the Facebook post referenced the altercation that occurred between Parker and Brown.  Although the post *does not mention Brown by name*, it was created on the same day after the altercation and referenced a fight with another woman."  *Id.* at 688 (emphasis added).  The court then addressed Brown's testimony, stating that "Brown testified that she viewed Parker's post through a mutual friend.  Thereafter, Brown 'shared' the post and published it on her own Facebook page."  *Id.*  Based on the circumstantial evidence and Brown's testimony, the court concluded that "[c]ollectively, this evidence was sufficient for the trial court to find that a reasonable juror could determine that the proffered evidence was authentic."  *Id.*

The evidence supporting authentication of the Facebook entries in this case is stronger than in *Parker*.  Not only do the entries on page four refer to the fight, but also Ms. Parker's entries on that page refer to earlier entries in which Ms. Conner is explicitly mentioned by name.  Additionally, Ms. Parker initially testified that she authored all the entries associated with her profile, and even after renouncing her authorship of the entries

5

on page four, she never denied that she authored the entries on page one. In *Parker*, the defendant never admitted authorship of the entries.

Use of social media as evidence in civil and criminal trials is likely to become increasingly important. Today we advanced our jurisprudence by adopting the "reasonable juror" standard and holding that circumstantial evidence can be sufficient to authenticate social media evidence. But the Majority set bad precedent in holding that a trial judge can establish such a high bar for authentication as the court did in the *Sublet* case. The Majority muddled our "reasonable juror" standard by refusing to accept Facebook posts as authenticated, based on an undisputed admission by the witness that she made posts referring to the fight at the party in a Facebook conversation with friends the day after the party, but denying the posts **on the same topic** occurring shortly thereafter. We would enunciate a clearer standard and advance the law more profitably if we affirmed the trial court rulings in *Harris* and *Monge-Martinez*, but reversed the trial court in *Sublet*.

Chief Judge Barbera and Judge Harrell authorize me to state that they join in the views expressed in this opinion.