STATE OF LOUISIANA      *      NO. 2024-KA-0452

VERSUS      *

         COURT OF APPEAL

TYRONE STEELE      *

         FOURTH CIRCUIT

     *

         STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 554-115, SECTION "C"
Honorable Benedict J. Willard
* * * * * *
**Judge Paula A. Brown**
* * * * * *

(Court composed of Judge Paula A. Brown, Judge Tiffany Gautier Chase, Judge Dale N. Atkins)

Jason R. Williams
DISTRICT ATTORNEY
Brad Scott
CHIEF OF APPEALS
Zachary M. Phillips
ASSISTANT DISTRICT ATTORNEY
ORLEANS PARISH
619 South White Street
New Orleans, LA 70119

       COUNSEL FOR STATE OF LOUISIANA/APPELLEE

Mary Constance Hanes
LOUISIANA APPELLATE PROJECT
P.O. Box 4015
New Orleans, LA 70178-4015

       COUNSEL FOR DEFENDANT/APPELLANT

                     **JUNE 12, 2025**
                     **AFFIRMED; REMANDED**

*PAB*
*TGC*
*DNA*

This is a criminal appeal. Appellant, Tyrone V. Steele ("Mr. Steele"), was indicted with multiple offenses, including first-degree murder in the death of Shane Brown ("Mr. Brown").  After a jury trial, Mr. Steele was convicted of the responsive verdict of second-degree murder.  He now appeals his conviction of second-degree murder.  For the reasons set forth below, Mr. Steele's conviction is affirmed.

## FACTS AND PROCEDURAL HISTORY

The facts relevant to this appeal focus on two separate instances of violence.[1]  In the early morning hours of March 21, 2022, Mr. Steele and an unnamed accomplice arrived at 4100 Encampment Street, Apartment 310 in New Orleans, Louisiana ("Apartment 310").  After spending time outside of the apartment deliberating, Mr. Steele and his accomplice entered through a window.  Once inside, Mr. Steele fired a substantial number of gunshots at the three individuals located inside—Darren Williams ("Mr. Williams"), Nehemiah Jones

---

[1] The trial in this matter also discussed the murder of Donald McNeil.  However, because Mr. Steele was found not guilty of his murder, the facts surrounding same will be pretermitted from this opinion.

1

("Mr. Jones"), and Amya Cornin ("Ms. Cornin"). The New Orleans Police Department ("NOPD") were summoned to the crime scene and, upon arrival, discovered that all three individuals were dead (the "triple homicide"). Later on that same day, Mr. Brown was seen for the last time. Thereafter, on March 26, 2022, Mr. Brown's body was discovered floating in a canal with a single gunshot wound to the head. Investigators discovered that Mr. Steele had been operating Mr. Brown's vehicle since March 21, 2022, the date on which Mr. Brown had last been seen. Once the vehicle was seized, it was discovered that the back seat was completely covered in Mr. Brown's blood.

On April 27, 2022, the State of Louisiana (the "State") charged Mr. Steele, via a bill of indictment, with several offenses, including:

- Count one – Second-degree murder of Donald McNeil in violation of La. R.S. 14:30.1;

- Count two – Illegal discharge of a firearm while committing a crime of violence or in violation of the Uniform Controlled Dangerous Substances Law in violation of La. R.S. 14:94(F);

- Count three – Conspiracy to commit aggravated burglary along with unindicted co-conspirator "S.B."[2] in violation of La. R.S. 14:(26)60;

- Count four – Aggravated burglary along with unindicted co-conspirator "S.B." in violation of La. R.S. 14:60;

- Count five – First-degree murder of Darren Williams along with unindicted co-conspirator "S.B." in violation of La. R.S. 14:30;

- Count six – First-degree murder of Nehemiah Jones along with unindicted co-conspirator "S.B." in violation of La. R.S. 14:30;

- Count seven – First-degree murder of Amya Cornin along with unindicted co-conspirator "S.B." in violation of La. R.S. 14:30;

_____

[2] The identification of "S.B." was not made part of the record.

- Count eight – First-degree murder of Shane Brown in violation in La. R.S. 14:30;

- Count nine – Conspiracy to commit first-degree murder along with unindicted co-conspirator Devonte Smith in violation of La. R.S. 14:(26)30; and

- Count ten – Illegal discharge of a firearm while committing a crime of violence or in violation of the Uniform Controlled Dangerous Substances Law in violation of La. R.S. 14:94(F).

On June 16, 2022, Mr. Steele pled not guilty to all charges. This matter came for a three-day jury trial on March 4, 2024. The State presented ten witnesses, of which six are germane to this appeal[3]: NOPD Detective Nicholas Davis ("Detective Davis"); Gloria Brown ("Ms. Brown"); NOPD Sergeant Robert Barrere ("Sergeant Barrere"); Justin Manuel ("Mr. Manuel"); Dr. Erin O'Sullivan ("Dr. O'Sullivan"); and Dr. Cynthia Gardner ("Dr. Gardner"). Mr. Steele did not call any witnesses of his own. The pertinent testimony elicited at trial is summarized below.

*Detective Davis*

Detective Davis, the investigating officer for the triple homicide at Apartment 310, testified that he arrived on the scene in the early morning hours of March 21, 2022. After review of surveillance footage of the apartment complex, he surmised that the triple homicide occurred at 2:55 a.m. and that two perpetrators entered Apartment 310 through the kitchen window. The victims were discovered to be Mr. Williams, Mr. Jones and Ms. Cornin. Detective Davis attested that Mr.

---

[3] Four additional witnesses testified in this matter, though their testimonies were not relevant to this appeal. Ms. Larries Smith is the mother of Donald McNeil. Because Mr. Steele was found not guilty of the murder of Mr. McNeil, we pretermit discussion of her testimony. NOPD Detective Christopher Puccio investigated Mr. McNeil's homicide. For the same reasons as Ms. Smith's testimony, we pretermit discussion of his testimony. Nelkita Jones is the mother of Nehemiah Jones. Her testimony largely focused on the life of her son and her experience of grief. While we appreciate her testimony, it is not relevant to the issues raised on appeal and will not be discussed further. Lastly, Renata Loya is the mother of Amya Cornin. For the same reasons as Ms. Jones' testimony, we pretermit discussion of Ms. Loya's testimony.

Williams was likely asleep on the living room couch at the time of receiving his first round of gunshot wounds. Based on that footage, after the initial shots were heard, a light came on in the bedroom where Mr. Jones and Ms. Cornin were later discovered. Soon after the light came on, there was a second round of gunshots, which presumably were those sustained by Mr. Jones and Ms. Cornin, who were later found embracing one another on the side of the bed. Shortly thereafter, a third round of gunshots were heard, which Detective Davis explained were additional gunshot wounds inflicted upon Mr. Williams. Detective Davis provided that none of the victims were in a position to defend themselves and there was no evidence that any of them had access to weapons. Several shell casings were found at the crime scene, with over seventeen casings being found in the living room where Mr. Williams' body was found. Upon further investigation, based on the shell casings, Detective Davis was able to determine that there was only one shooter, despite there being two perpetrators seen breaking into Apartment 310.

Honing in further on the apartment complex footage, Detective Davis described that two subjects were loitering outside of the window of Apartment 310 around 1:27 a.m. The footage reflected that the subjects were attempting to open the window that they ultimately entered through. Notably, one of the subjects was noticeably shorter than the other, and the shorter of the two was wearing a white shirt underneath a black hooded sweatshirt. Detective Davis specifically stated that the shorter of the two subjects entered the apartment first and left the apartment last. Nonetheless, the footage clearly showed that each subject had a firearm in hand. A second piece of surveillance footage depicted a gray Nissan Altima, later determined to belong to Mr. Brown, driving away from the crime

4

scene at a high rate of speed. The timestamp of the vehicle driving away matched with the approximate time that the triple homicide took place.

In the course of his investigation, Detective Davis identified Mr. Steele as a suspect. An integral portion of his testimony focused on an Instagram account with the screen name "omerta.07."[4] After issuing a search warrant for the account and investigating its contents, Detective Davis discovered multiple photos and videos of Mr. Steele. Detective Davis specified that the videos on the account contained sound bites of Mr. Steele's voice. He did not locate any photos or videos on the account that represented posts by any other individual besides Mr. Steele. The account also contained posts depicting the building and window of Apartment 310 where the two subjects in the surveillance footage ultimately climbed through prior to executing the triple homicide. After the triple homicide, the holder of the account also posted photos of Mr. Jones and Mr. Williams. Another post contained the caption "I hit Duke and Lil Miah and his bitch." Detective Davis offered that "Duke" was a known nickname for Mr. Williams and "Lil Miah" referred to Mr. Jones. In furtherance of authenticating the account as being Mr. Steele's, the State pointed out photos displaying tattoos on the back of the account user's left hand, which corresponded with the tattoos on the back of Mr. Steele's left hand. The State had Mr. Steele show the back of his left hand to the jury in order for them to observe the tattoos. Detective Davis also discussed two specific posts on the account which, in his opinion, contained information related to the investigation of the triple homicide that was not yet released to the public. First, one post contained the words, "So y'all seen his face, closed casket." Detective

---

[4] Both briefs filed in this matter refer to the Instagram account as "Omurta.07." However, the exhibits submitted to this Court refer to the account with the spelling "omerta.07" and we will refer to it as same.

Davis provided that it was his belief that this post referred to Mr. Williams, who had been shot eighteen times in his face. The details of Mr. Williams' injuries had not yet been released to the public. Second, the account posted a photo of the BOLO (Be On the Look Out) released to the media for persons of interest in the triple homicide. The caption on this photo referenced that people "don't know I was one shooter." Again, Detective Davis specified that at this time in the investigation, it had not been disclosed to the public that the investigators believed there was only one shooter involved in the triple homicide. According to Detective Davis, these two posts revealed information that only the perpetrator could have known.

On cross-examination, Detective Davis attested that he had no pictures of Mr. Steele actually posting to the account. However, Detective Davis explained that because the only photographs on the account were of Mr. Steele, his name was referenced many times on the account and people who were messaging that account referred to the account holder as Tyrone, he believed the account was associated with Tyrone Steele. In addition, posted on the account following the triple homicide was a photograph of Mr. Steele wearing a white shirt and black hooded sweatshirt, which matched the same clothing that the shorter subject was wearing when he climbed through the window at Apartment 310 on the night of triple homicide.

Detective Davis detailed that as a result of the investigation, Mr. Steele was arrested. A search of his residence was conducted and numerous firearms and large amounts of narcotics were found. Also recovered was a gold bracelet, which was consistent with a bracelet that had been posted on the Instagram account. The bracelet was found to be connected to Mr. Jones. Regarding motive for the

6

shootings, Detective Davis testified that, on February 27, 2022, Mr. Steele and Mr. Williams engaged in an verbal altercation at Spider's Meat Market, which later turned into a shootout. Detective Davis reviewed the meat market's surveillance footage and described that Mr. Williams fired at Mr. Steele who then fired multiple rounds back in Mr. Williams's direction. The shootout took place twenty-two days before Mr. Williams—along with Mr. Jones and Ms. Cornin—was murdered. According to messages from his Instagram account, Mr. Steele "felt played" because he was apparently grazed by a bullet during the shootout and had to limp away from the scene. Detective Davis testified that investigators were able to ballistically link the 9-millimeter shell casings collected from the meat market on February 27, 2022 to the triple homicide at Apartment 310 on March 21, 2022.

*Ms. Brown*

Ms. Brown, Mr. Brown's mother, provided that when he did not return home after a night out with friends and was unresponsive to her messages, she attempted to track him on his cell phone. She tracked his cell phone to an apartment complex where she also saw Mr. Brown's vehicle, a gray Nissan Altima, in the parking lot. She reported this location to the police. While the police did not find her son inside of the apartment complex, they informed her a few days later that they had found his body in a canal.

*Sergeant Barrere*

Sergeant Barrere testified that he began an investigation into the missing person's report of Mr. Brown filed by his mother. After gathering information from Ms. Brown, Sergeant Barrere went to the identified apartment complex where he and a detective located the Nissan Altima in the parking lot. The accompanying detective obtained surveillance footage from the complex depicting the parking lot

where the Nissan Altima was parked. In this footage, Sergeant Barrere observed a subject arriving at the complex in Mr. Brown's vehicle, staying in the vehicle momentarily, and then exiting the vehicle. Upon his exit, the subject removed a rifle from the vehicle and placed it down his pant leg, then walked toward the complex to enter an apartment. The subject was also wearing a maroon colored backpack, which matched the backpack seized from the house where Mr. Steele was arrested. Sergeant Barrere stated that the individual in this footage was consistent with Mr. Steele because the individual was wearing the exact same clothing that Mr. Steele was seen wearing on Ring doorbell footage from the day Mr. Brown went missing, March 21, 2022. In this Ring doorbell footage, Mr. Steele is actually seen with Mr. Brown. Mr. Brown was wearing the same Polo brand shirt that he was wearing when his body was recovered, and Mr. Steele was wearing the same hooded sweatshirt he had on when getting out of Mr. Brown's vehicle in the parking lot footage.

Sergeant Barrere also attested that he was able to review the surveillance footage from the triple homicide and confirmed that the vehicle seen speeding away from Apartment 310 was the same one he located at the apartment complex. Upon inspection of the vehicle, Sergeant Barrere described the interior condition of Mr. Brown's vehicle as having large amounts of blood in the backseat and under the backseat, which testing showed was Mr. Brown's blood. On March 26, 2022, Mr. Brown's body was discovered in a canal. Sergeant Barrere provided that during the course of this investigation, it was ascertained that Mr. Brown died as a result of a gunshot wound from a Glock Gen5 handgun to the head. Based on the above, Mr. Steele was located and arrested on the evening of March 30, 2022. A

8

search of the residence uncovered numerous loaded weapons hidden throughout the house, including two Glock 19 Gen5, 9-millimeter handguns.

Sergeant Barrere stated that Mr. Steele, in an interview following his arrest, denied knowing Mr. Brown. However, an examination of Mr. Brown's Instagram account and the account linked to Mr. Steele revealed a conversation between the two about bullets and committing a shooting. This communication took place on March 20, 2022, one day before the triple homicide. Sergeant Barrere definitively stated that his investigation yielded no evidence suggesting any other suspects besides Mr. Steele in Mr. Brown's murder.

*Mr. Manuel*

Mr. Manuel, a DNA analyst at the Louisiana State Police Crime Lab, conducted DNA testing on blood from the rear passenger seat and on the gearshift of Mr. Brown's vehicle.[5] He found the blood from the rear passenger seat to be Mr. Brown's blood. A swab from the gearshift of Mr. Brown's vehicle revealed skin cells belonging to Mr. Steele. Mr. Manuel testified that, when compared with a DNA sample taken from Mr. Steele, the gearshift swab reflected that it was 72.4 billion times more probable that the DNA collected from the gearshift was a match for Mr. Steele's DNA as compared to an unrelated individual.

*Dr. O'Sullivan*

Dr. O'Sullivan, a forensic pathologist with the Orleans Parish Coroner's Office, conducted Ms. Cornin's autopsy on March 22, 2022, and found that Ms. Cornin had received seven gunshot wounds.[6] On the same day, Dr. O'Sullivan

---

[5] Mr. Manuel was qualified as an expert in forensic DNA analysis.

[6] Dr. O'Sullivan, who was qualified as an expert in forensic pathology, conducted several autopsies relevant to this appeal. Dr. O'Sullivan conducted the autopsy of Donald McNeil, so

conducted Mr. Jones' autopsy, and discovered that he suffered four gunshot wounds. The next day, March 23, 2022, Dr. O'Sullivan conducted Mr. Williams' autopsy, and determined that he suffered eighteen gunshot wounds. After conducting these autopsies, Dr. O'Sullivan found that all three victims died as a result of multiple gunshot wounds and recommended that the coroner classify each of their deaths as homicides.

*Dr. Gardner*

Dr. Gardner, the deputy chief forensic pathologist with the Orleans Parish Coroner's Office, conducted Mr. Brown's autopsy on March 28, 2022. The autopsy revealed that Mr. Brown had suffered one fatal gunshot wound to the back of his head.[7] She classified his death as a homicide.

Following the trial, on March 7, 2024, the jury found Mr. Steele guilty as charged on counts two through seven and not guilty on counts one, nine and ten. As for count eight, the first-degree murder of Mr. Brown, the jury found Mr. Steele guilty of the responsive verdict of second-degree murder. On March 18, 2024, the district court sentenced Mr. Steele as follows:

- Count two (illegal discharge of a firearm while committed a crime of violence) – twenty years imprisonment at hard labor to run consecutively with the sentences imposed in connection with counts three and four;

- Count three (conspiracy to commit aggravated burglary) – twenty years imprisonment at hard labor to run consecutively with the sentence imposed in connection with count four;

- Count four (aggravated burglary) – thirty years imprisonment at hard labor to run consecutively with the sentences imposed for counts five, six, seven and eight;

---

that portion of her testimony will be pretermitted as Mr. Steele was found not guilty on the murder charge of Donald McNeil.

[7] Dr. Gardner was qualified as an expert in forensic pathology.

- Count five (first-degree murder of Mr. Williams) – life imprisonment at hard labor without the benefit of probation, parole or suspension of sentence;

- Count six (first-degree murder of Mr. Jones) – life imprisonment at hard labor without the benefit of probation, parole or suspension of sentence;

- Count seven (first-degree murder of Ms. Cornin) – life imprisonment at hard labor without the benefit of probation, parole or suspension of sentence; and

- Count eight (second-degree murder of Mr. Brown) – life imprisonment at hard labor without the benefit of probation, parole or suspension of sentence.

After sentencing, counsel for Mr. Steele objected to the automatic life sentences and to the consecutive nature of the sentences. Mr. Steele filed a motion for appeal on the same day as his sentencing hearing, March 18, 2024, which the district court granted on March 20, 2024. This timely appeal followed.

## ERRORS PATENT

Appellate courts review criminal appeal records for the existence of a patent error. *See* La. C.Cr.P. art. 920(2).[8] A review of the record revealed one error patent: Mr. Steele's sentencing for count two, illegal discharge of a firearm while committing a crime of violence. At the sentencing hearing, the district court judge stated that the sentence for count two was going to be twenty years "to run consecutive to [c]ounts [three] and [four]. *Those sentences shall run without the benefit of probation, parole or suspension of sentence*." (emphasis added)

---

[8] Louisiana Code of Criminal Procedure art. 920(2) provides that the scope of appellate review includes: "An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."

11

However, it is unclear to which sentences the district court judge was referring when he stated that they would run without benefits.

As it relates to count two, illegal discharge of a firearm while committing a crime of violence, La. R.S. 14:94(F) provides, in pertinent part, that an individual convicted of "illegal use of weapons or dangerous instrumentalities by discharging a firearm while committing . . . a crime of violence . . . shall be imprisoned at hard labor for not less than ten years nor more than twenty years, without benefit of parole, probation, or suspension of sentence." Conversely, count four, aggravated burglary, La. R.S. 14:60(B) provides that "[w]hoever commits the crime of aggravated burglary shall be imprisoned at hard labor for not less than one nor more than thirty years." Lastly, count three, conspiracy to commit aggravated burglary, La. R.S. 14:26(C) provides, in pertinent part, that an individual who "is a party to a criminal conspiracy to commit any crime shall be fined or imprisoned, or both, in the same manner as for the offense contemplated by the conspirators." Notably, neither La. R.S. 14:60 nor La. R.S. 14:26 allow for a sentence to be imposed without benefit of parole, probation, or suspension of sentence.

Accordingly, because it is unclear from the record which of "those sentences" the district court ordered to run without benefits, we remand this matter to the district court to clarify the sentences for counts two, three and four.

## DISCUSSION

This appeal is solely connected to Mr. Steele's second-degree murder conviction related to Mr. Brown. Mr. Steele alleges three assignments of error,

which we summarize as follows: (1) there was insufficient evidence to support his conviction for the second-degree murder of Mr. Brown; (2) the district court abused its discretion in allowing the State to introduce certain exhibits from an unauthenticated Instagram account; and (3) the district court abused its discretion in denying his motion for a mistrial after the State showed the jury a photo from the unauthenticated Instagram account. Considering the second assignment of error is procedural in nature, we will begin our discussion there.

*Assignment of Error No. 2 – Introduction of Exhibits from Instagram Account*

In his second assignment of error, Mr. Steele argues that the district court abused its discretion in allowing the State's introduction of videos, photos, and message strands from the Instagram account, "omerta.07", without properly authenticating the account.

"Authentication is a condition precedent to admissibility." *State v. Groves*, 20-0450, p. 29 (La. App. 4 Cir. 6/10/21), 323 So.3d 957, 975 (citing La. C.E. art. 901(A)). According to the Louisiana Code of Evidence, authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." La. C.E. art. 901(A). "A district court has great discretion in deciding whether a party laid a sufficient foundation for the admission of evidence." *Groves*, 20-0450, p. 29, 323 So.3d at 975 (citing *State v. Ashford*, 03-1691, p. 14 (La. App. 4 Cir. 6/16/04), 878 So.2d 798, 806). "An appellate court reviews a district court's ruling on the admissibility of evidence under the abuse of

13

discretion standard." *Id.* (citing *State v. Wright*, 11-0141, pp. 10-11 (La. 12/6/11), 79 So.3d 309, 316).

In *State v. Smith*, this Court determined that when reviewing the issue of authenticating social media evidence, a "reasonable juror" standard applies, such that the proper inquiry is whether there exists "sufficient evidence to support a finding that the proffered evidence is what it is claimed to be . . . ." 15-1359, pp. 9-10 (La. App. 4 Cir. 4/20/16), 192 So.3d 836, 842 (quoting *Sublet v. State*, 442 Md. 632, 669, 113 A.3d 695, 717 (Md. 2015)). "Sufficient proof will vary from case to case, and '[t]he proof of authentication may be direct or circumstantial.'" *Id.* at p. 10, 192 So.3d at 842 (internal quotations omitted) (quoting *Sublet*, 442 Md. at 667, 113 A.3d at 715). Thus, "the type and quantum of evidence will depend on the context and the purpose of its introduction. Evidence which is deemed sufficient to support a reasonable juror's finding that the proposed evidence is what it is purport[ed] to be in one case, may be insufficient in another." *Id.* Ultimately, this Court "must determine whether the State offered sufficient facts from which the jury could reasonably find the evidence authentic." *Id.* If this "reasonable juror" standard is met, then the "[district] court did not abuse its discretion in ruling the social media posts admissible at trial." *Id.*

Interestingly, Mr. Steele asserts that the present matter is analogous to *Smith* because he claims the issue in each matter turned on whether evidence proved that the defendant made the posts on the Instagram account themselves. However, upon review of *Smith*, the State in that matter presented no evidence for

14

authentication whatsoever. Specifically, this Court noted that "the issue is whether the [district] court, in its gatekeeping function, abused its discretion by ruling the evidence admissible without requiring the State to submit evidence to meet the low threshold test necessary to authenticate the social media posts." 15-1359, pp. 11-12, 192 So.3d at 843. This quote simultaneously reinforces the concept that the authentication of social media posts imposes a low burden, while also noting that the State in that matter did not put forth any evidence for authentication. For clarity, the *Smith* court further remarked that "the State's failure to submit evidence demonstrating the authenticity of the social media evidence . . . " contributed to its conclusion. *Id.* at p. 12, 192 So.3d at 843.

We do not find *Smith* to be analogous to the matter *sub judice*. Here, the State provided several pieces of evidence associating Mr. Steele with the Instagram account. Detective Davis testified that during his investigation into the account, he located photos and videos depicting Mr. Steele, as well as videos containing clips of Mr. Steele's voice. He further specified that no other person's photo, video or voice were found in any posts on the account. Additionally, certain posts on the account depicted tattoos on the back of an individual's left hand which corresponded with tattoos on the back of Mr. Steele's left hand. The account also contained posts with direct links to the triple homicide, to which Mr. Steele was strongly connected. Specifically, these posts consisted of photos of a bracelet taken from one of the triple homicide victims, Mr. Jones, along with photos of the triple homicide apartment building and the window where the assailants broke into

the apartment, as well as photos of two of the victims, Mr. Williams and Mr. Jones. Further, a statement admitting to the guilt of the triple homicide was posted, which read "I hit Duke and Lil Miah and his bitch." As previously mentioned, Detective Davis stated that "Duke" was a known nickname for Mr. Williams and "Lil Miah" referred to Mr. Jones. Finally, Detective Davis testified that several private messages sent to the account referred to the account holder as "Tyrone."

Considering all of the evidence presented by the State to authenticate the account as being that of Mr. Steele, not only is this set of facts incomparable to the facts of *Smith*, but we also find that there was sufficient evidence presented by the State such that a reasonable juror could find that the account was what the State purported it to be—an Instagram account belonging to Mr. Steele. Accordingly, this assignment of error is without merit.

*Assignment of Error No. 1 – Sufficiency of Evidence for Second-Degree Murder*

In his first assignment of error, Mr. Steele contends the evidence, which he claims was entirely circumstantial, was insufficient to find him guilty of second-degree murder of Mr. Brown. Mr. Steele argues that the State did not exclude every reasonable hypothesis of innocence, such as an individual who knew the victims of the triple homicide that retaliated against Mr. Brown.

"Appellate courts review the sufficiency of evidence used to support a conviction under the *Jackson* standard." *State v. Riley*, 23-0040, p. 12 (La. App. 4 Cir. 8/31/23), 372 So.3d 77, 86 (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979)). "Under *Jackson* 'the relevant question is whether,

after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson,* 443 U.S. at 319, 99 S. Ct. at 2789). "The principal [criterion] of a *Jackson . . .* review is rationality." *Id.* (quoting *State v. Dukes*, 19-0172, p. 7 (La. App. 4 Cir. 10/2/19), 281 So.3d 745, 752). "As such, 'irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.'" *Id.* at pp. 12-13, 372 So.3d at 86 (quoting *State v. Alexis*, 14-0327, p. 6 (La. App. 4 Cir. 12/3/14), 157 So.3d 775, 778). "[W]here there is no direct evidence presented proving one or more of the elements of the offense, La. R.S. 15:438 governs circumstantial evidence and provides 'assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.'" *State v. Mealancon*, 21-0119, pp. 6-7 (La. App. 4 Cir. 12/22/21), 334 So.3d 792, 797 (quoting *State v. Hutsell*, 17-0112, p. 15 (La. App. 4 Cir. 4/18/18), 241 So.3d 542, 551). "Stated differently, the reviewer as a matter of law, can affirm the conviction only if the reasonable hypothesis is the one favorable to the [S]tate and there is no extant reasonable hypothesis of innocence." *Id.* at p. 7, 334 So.3d at 798 (internal quotations omitted) (quoting *State v. Green*, 449 So.2d 141, 144 (La. App. 4th Cir. 1984)). "This test is not separate from the *Jackson* standard; rather it simply requires that all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is

guilty beyond a reasonable doubt." *Id.* (internal quotations omitted) (quoting *State v. Hoang*, 16-0479, p. 3 (La. App. 4 Cir. 12/21/16), 207 So.3d 473, 475). "If a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis falls; and, unless another one creates reasonable doubt, the defendant is guilty." *Id.* (citing *State v. Captville*, 448 So.2d 676, 680 (La. 1984)). "Therefore, 'where the evidence is purely circumstantial, if it does not exclude every reasonable hypothesis of innocence, a rational juror cannot find defendant guilty beyond a reasonable doubt without violating constitutional due process safeguards.'" *Id.* (quoting *State v. Monds*, 91-0589 (La. App. 4 Cir. 2/10/94), 631 So.2d 536, 539).

Mr. Steele was indicted for first-degree murder, a violation La. R.S. 14:30, but was convicted of the responsive verdict[9] of second-degree murder, a violation of La. R.S. 14:30.1. Based upon our review of the record, Mr. Steele failed to object to the inclusion of second-degree murder as a responsive verdict to the charge of first-degree murder. "In instances where a defendant fails to lodge a contemporaneous objection, 'when the trial judge may take action, a reviewing court may affirm if the evidence supports a conviction of the greater offense.'" *State v. Billiot*, 23-0529, p. 18 (La. App. 4 Cir. 5/16/25), ___ So.3d ___, ___, 2025 WL 1420316, *9 (quoting *State v. Pleasant*, 10-1533, p. 7 (La. App. 4 Cir. 5/18/11), 66 So.3d 51, 56).

---

[9] There are four responsive verdicts for first-degree murder: (1) guilty; (2) guilty of second-degree murder; (3) guilty of manslaughter; and (4) not guilty. La. C.Cr.P. art. 814(A)(1).

18

Louisiana Revised Statutes 14:30(A)(11) provides that first-degree murder is the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm and the offender has previously acted with a specific intent to kill or inflict great bodily harm that resulted in the killing of one or more persons." Pursuant to La. R.S. 14:30.1, in part, second-degree murder is the killing of a human being:

> (1) When the offender has a specific intent to kill or to inflict great bodily harm; or
> (2) When the offender is engaged in the perpetration or attempted perpetration of aggravated or first[-]degree rape, forcible or second[-]degree rape, aggravated arson, aggravated burglary, aggravated kidnapping, second[-]degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first[-]degree robbery, second[-]degree robbery, simple robbery, cruelty to juveniles, second[-]degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.

La. R.S. 14:30.1(A)(1)-(2). Specific intent is defined as the "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1).

The evidence adduced at trial shows that the date March 21, 2022, represents both the date of the triple homicide as well as the date Mr. Brown was last seen alive. Mr. Brown died from a single gunshot wound to the back of his head. Ring doorbell footage from March 21, 2022, revealed Mr. Brown and Mr. Steele were together in the 1700 block of Spain Street. In that footage, Mr. Brown was wearing the same Polo brand shirt that his body was later discovered in. The same footage depicted Mr. Steele wearing the hooded jacket that he was later shown

19

wearing in the parking lot footage of him exiting Mr. Brown's vehicle, without Mr. Brown. Mr. Brown's vehicle was identified in the triple homicide surveillance footage as the vehicle speeding away from that crime scene. Once the vehicle had been confiscated and brought in for inspection, it was revealed that nearly the entire backseat was covered in Mr. Brown's blood. Not only was Mr. Brown's blood in the vehicle, but it was further supported that Mr. Steele had been driving the vehicle because his DNA was found on the gearshift. In addition to the DNA evidence confirming Mr. Steele's identity as the driver of the vehicle in the parking lot footage, that footage also depicted Mr. Steele wearing a maroon-colored backpack, which was later seized from the home where he was located at the time of his arrest. Moreover, the evidence reflects that the same Glock Gen5 handgun, which was recovered from the residence where Mr. Steele was arrested, was used in both the triple homicide and Mr. Brown's murder.

Based upon our review, the record is completely devoid of any evidence to show a reasonable hypothesis of innocence. To the contrary, we find that the evidence supports a conviction of the greater offense, first-degree murder. As we previously noted, La. R.S. 14:30.1(1) only requires that an offender have specific intent to kill or cause great bodily harm in order to be convicted of second-degree murder, whereas La. R.S. 14:30.1(2) does not require specific intent, but the murder must occur during the commission of at least one of certain enumerated offenses. In contrast, in order to find an offender guilty of first-degree murder pursuant to La. R.S. 14:30, specific intent is always required in conjunction with

20

the commission of certain enumerated offenses or circumstances. In this instance, Mr. Steele was neither charged with nor indicted for any of the enumerated offenses listed in La. R.S. 14:30.1(2) in connection with the murder of Mr. Brown; thus, we can only conclude that when the jury found Mr. Steele guilty of the responsive verdict of second-degree murder, it determined that the circumstantial evidence was sufficient to find that Mr. Steele had the specific intent to kill or cause great bodily harm to Mr. Brown when he shot him in the head. We agree. Furthermore, we note that the record reflects that the triple homicide[10] occurred prior to Mr. Brown's murder, which implicates La. R.S. 14:30(A)(11)—i.e., Mr. Steele had previously acted with a specific intent to kill or inflict great bodily harm that resulted in the killing of one or more persons. Therefore, we find that the record contains sufficient evidence to establish that Mr. Steele was guilty of the greater offense, first-degree murder. Applying the reasoning we articulated in *Billiot* ("a reviewing court may affirm if the evidence supports a conviction of the greater offense" 23-0529, p. 18, ___ So.3d at ___, 2025 WL 1420316, *9), further review is unnecessary—we affirm Mr. Steele's conviction of the responsive verdict of second-degree murder. This assignment of error lacks merit.

*Assignment of Error No. 3 – Denial of Mr. Steele's Motion for Mistrial*

In Mr. Steele's final assignment of error, he asserts that the district court erred in denying his motion for mistrial based upon the State's failure to properly authenticate the above-discussed Instagram account. Specifically, Mr. Steele

---

[10] Mr. Brown did not to appeal any of those convictions connected to the triple homicide.

21

argues that that State failed to present sufficient evidence to confirm that the account is what it claims it is—an account belonging to Mr. Steele. Thus, he contends that the evidence from the Instagram account was prejudicial evidence and he was therefore denied a fair trial.

Louisiana Code of Criminal Procedure article 775 provides, in pertinent part, that "[u]pon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial . . . ." However, "[m]istrial is an extreme remedy and, except for instances in which the mandatory mistrial provisions of La. [C.Cr.P.] art. 770[11] are applicable, should only be used when substantial prejudice to the defendant is shown." *State v. Jenkins*, 19-1024, pp. 15-16 (La. App. 4 Cir. 9/30/20), 365 So.3d 55, 66 (quoting *State v. Castleberry*, 98-1388, p. 22 (La. 4/13/99), 758 So.2d 749, 768). "The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on

---

[11] Louisiana Code of Criminal Procedure article 770 provides the following:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
> (1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
> (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
> (3) The failure of the defendant to testify in his own defense; or
> (4) The refusal of the judge to direct a verdict.
> An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

appeal absent an abuse of that discretion." *Id.* at p. 16, 365 So.3d at 66 (citation omitted).

As discussed elsewhere in this opinion, we do not find that the district court abused its discretion by admitting the contents of the Instagram account into evidence. It then follows that, absent an abuse as to the authentication of the Instagram account, there was no prejudice to Mr. Steele and there exist no grounds which would warrant a mistrial. We further note that none of the mandatory grounds for mistrial under La. C.Cr.P. art. 770 are present in this matter. In sum, we find that the district court did not abuse its discretion in denying Mr. Steele's motion for mistrial. This assignment of error is without merit.

## DECREE

For the foregoing reasons, we affirm Mr. Steele's conviction. We remand the matter to the district court solely for clarification of the sentencing of counts two (illegal discharge of a firearm while committing a crime of violence), three (conspiracy to commit aggravated burglary) and four (aggravated burglary).

**AFFIRMED; REMANDED**